IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| BROOKLYN S.-M., through her | : | |
| Parent, GABRIELLE M., | : | |
| of Upper Darby, PA 19082 | : | |
| | : | Civil Action |
| Plaintiff | : | |
| v. | : | |
| | : | No. |
| UPPER DARBY | : | |
| SCHOOL DISTRICT | : | |
| 4611 Bond Avenue | : | |
| Drexel Hill, PA 19026 | : | |
| | : | |
| Defendant | : | |

## COMPLAINT

**I.   Preliminary Statement**

1.      Brooklyn S.-M., a student with disabilities ("Brooklyn" or "Student"), and her mother

("Parent"), Gabrielle M. (collectively "Plaintiffs" or "Family"), bring this action against Upper Darby

School District ("Defendant" or "District"), under the Individuals with Disabilities Education Act

("IDEA"), 20 U.S.C. § 1400 *et seq.*, and its federal and state implementing regulations; Section 504

of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. §§ 794 and 794(a), and its federal and

state implementing regulations; and Chapters 14 and 15 of the Pennsylvania Code.

2.      Brooklyn is a fifth-grade student who has resided in the District and attended District

schools since her kindergarten year in 2016-17. Brooklyn has been diagnosed with a Specific

Learning Disability ("SLD") in both reading and math, Disruptive Mood Dysregulation Disorder, and

Other Specified Depressive Disorder.

3.      At all relevant times, the District failed pursuant to the IDEA and Section 504 to

provide Brooklyn with an appropriate special education program and placement to meet her needs.

The District failed to timely and appropriately evaluate Brooklyn under both IDEA and Section 504;

incorrectly determined Brooklyn to be ineligible under the IDEA, thereby failing to provide her with

any program and placement under that Act, and failed to develop an appropriate Section 504 Plan despite later finding her eligible under Section 504.

4.      Because the District's educational program was not meeting Brooklyn's needs, Parent filed an educational administrative due process complaint on March 31, 2021, raising claims under IDEA and Section 504, seeking: (1) a determination that the District failed to timely evaluate and identify Brooklyn as an eligible student under both Section 504 and IDEA; (2) a determination that Brooklyn is eligible under the IDEA under the classification of Specific Learning Disability ("SLD"); (3) an order that the District develop an appropriate Individualized Education Plan ("IEP") that addresses Brooklyn's academic and social-emotional needs; and (4) compensatory education for the time period of March 31, 2019 through the present and until such time as the District develops and implements and appropriate IEP.

5.      After a due process hearing, Cheryl Cutrona, Esquire, a Pennsylvania Hearing Officer, issued a decision that rightly found that the District's 504 Plan was inappropriate and had denied a Free Appropriate Public Education ("FAPE") but wrongly denied the Family's other claims. The Decision awarded a small amount of compensatory education, which is grossly insufficient given the legal violations in this case.

6.      The Hearing Officer erred in failing to find that: (1) the District violated its "Child Find" obligations under both the IDEA and Section 504; (2) the District failed to timely and comprehensively evaluate Brooklyn; and (3) the District inappropriately failed to identify Brooklyn as eligible for special education and an IEP under the IDEA, resulting in a denial of FAPE.

7.      Well-settled precedent requires this Court to undertake an independent review of the record and the decision of the Hearing Officer. *Rowley v. Board of Educ.*, 458 U.S. 176, 206-07 (1982); *Susan N. v. Wilson School Dist.*, 70 F.3d 751, 759 (3d Cir. 1995).

8.      After fully considering the entire record, this Court should affirm the finding that the 504 Plan was inappropriate, reverse the Hearing Officer's decision in all other regards, and award appropriate relief to the Family, including attorneys' fees and costs.

## II.    Parties

9.      Brooklyn was born in 2010 and, at all times relevant to this action, resided in Upper Darby, Pennsylvania, within the geographical boundaries of the District. Brooklyn is an eligible student with disabilities under IDEA and a "qualified handicapped student" under Section 504.

10.     Gabrielle M. is Brooklyn's Parent. At all times relevant to this action, she has resided with Brooklyn in Upper Darby, Pennsylvania, within the geographical boundaries of the District.

11.     The Upper Darby School District is located at 4611 Bond Avenue, Drexel Hill, Pennsylvania. It is the recipient of several sources of federal funds and is an educational agency designated by Pennsylvania law and the Pennsylvania Department of Education for the provision of educational services to individuals residing within its boundaries. Such services include those mandated under IDEA and Section 504. 24 P.S. Chapter 13; 22 Pa. Code Chapters 14 and 15.

## III.   Jurisdiction and Venue

12.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this case raises federal questions under the IDEA and Section 504.

13.     Plaintiffs have exhausted administrative remedies where required under 20 U.S.C. § 1415(i), having litigated a special education due process complaint. 20 U.S.C. § 1415(i)(2)(A).

14.     20 U.S.C. § 1415 and 28 U.S.C. §§ 2201 and 2202 authorize Plaintiffs' claims and remedies. These provide for declaratory and any further relief deemed necessary and proper.

3

15.     All the Defendant's actions complained of here have taken place within the jurisdiction of the United States District Court for the Eastern District of Pennsylvania. Venue is appropriate in this District pursuant to 28 U.S.C. § 1391.

IV.     **Additional Facts Supporting Liability**

16.     Brooklyn is a 11-year-old fifth-grade student who has attended Garrettford Elementary School in the District from kindergarten until the present. During this entire time, she has exhibited social-emotional, self-regulation, and academic needs, as documented by teachers and Parent.

17.     During her kindergarten year (2016-17), Brooklyn's teacher noted on her report card that she needed improvement in attention during instruction and verbal/physical self-control. She also communicated that Brooklyn was not progressing in writing, did not always pay attention when directions were given, and was tearful when she would not get her way. Benchmark tests revealed her to be below or well below the standard benchmark range. Curriculum-based assessments ("CBAs") indicated she was not yet proficient in myriad areas, and her mathematics scores were "Basic" (low) or "Below Basic" (lowest).

18.     Despite those concerns with Brooklyn's academic and social/emotional functioning, when the Family requested a comprehensive psychoeducational evaluation that year the District refused, incorrectly deciding that cognitive and academic testing was not appropriate. Instead, it evaluated her for speech and language concerns only. The District ultimately found her eligible under IDEA as a student with a Speech and Language Impairment ("SLI") and issued an IEP at the end of kindergarten for Speech and Language ("S/L") services alone.

19.     The District failed at that time and in ensuing years to fulfill its duties to perform a timely and comprehensive evaluation, to identify Brooklyn's disabilities fully, and to provide an

4

appropriate IEP for her; at the same time Brooklyn's academic and social-emotional difficulties continued to increase. She achieved only below- and well-below average performance in reading, written expression, and math. Her social-emotional struggles increased both at home and at school.

20.     Predictably, by the end of her kindergarten year, Brooklyn was still having social and emotional difficulties and scored "Not Yet Proficient" in phonemic awareness; letter-sound associations; rapid reading; writing; active listening; and math fluency in addition/subtraction.

21.     Throughout her first-grade year (2017-18), Brooklyn consistently scored Below Basic or Well Below Basic on various standardized math and reading assessments and categories, and her social/emotional issues continued to mount. Despite these continuing struggles, at no point in Brooklyn's first-grade year did the District initiate an evaluation under Section 504 or IDEA to determine her eligibility for supports or services to address these areas of need.

22.     In her second-grade year (2018-19), Brooklyn expressed suicidal ideation. She began therapy outside school and was diagnosed with Other Specified Depressive Disorder. She thereafter underwent outpatient therapy once per week. That same month, the District began the process of reevaluating Brooklyn, but it again inappropriately limited its evaluation to speech and language issues despite knowing of Brooklyn's continuing academic and social-emotional challenges. The District then terminated her "speech-and-language-only-IEP" and removed her from any special education services, finding she had mastered her S/L issues. Meanwhile, Brooklyn's assessments revealed mostly Basic scores in reading and math. Her Below Benchmark scores continued in two categories of reading. Parent and teachers continued to report that she was struggling academically, was easily distracted, had difficulties with poor social skills, and quickly and easily became upset, aggressive, argumentative and overly emotional. Nonetheless, the District still did not comprehensively evaluate Brooklyn.

5

23.     Brooklyn began her third-grade year (2019-20) by scoring below average on reading and writing CBAs. Her academic struggles continued. In the third marking period, Brooklyn scored below average on half of her assessments. In the fourth marking period, she was below average on all of them. Her math chapter tests also revealed Below Basic scores on all assessments. Brooklyn's writing workshop CBA scores and Measures of Academic Performance ("MAP") assessments also reflected challenges.

24.     Brooklyn's social-emotional difficulties also increased in third grade. She would easily become upset and cry if a task was too challenging or if asked to stop a preferred task. She also displayed a lack of self-confidence and would have difficulty recovering from any sort of setback, however minor. Brooklyn got into arguments with other students, which affected her during academic classes. Brooklyn's third-grade teacher was so concerned about her social-emotional status that she contacted Parent and ultimately referred Brooklyn for counseling with the school social worker.

25.     At the start of her fourth-grade school year (2020-21), Brooklyn scored Below Basic in math and reading MAP assessments. Her initial reading CBAs were well below average in reading and below average in writing as well as math chapter tests. Brooklyn continued to struggle with academic functioning throughout the year, continuing to obtain Basic, Below Basic, and Well Below Basic scores. Brooklyn also continued to experience increasing social-emotional difficulties.

26.     In September of 2020, a licensed psychologist privately evaluated Brooklyn and diagnosed her with Disruptive Mood Dysregulation Disorder, which Parent shared with the District. Parent again requested a full evaluation based on her own perceptions of further-increased social/emotional and academic concerns. The District finally agreed. It completed and issued its evaluation report ("ER") in December 2020.

27.     The ER included data and input from multiple sources. Brooklyn's fourth-grade

6

teacher reported she had challenges with distraction and independent work. Parent reported that Brooklyn was fidgety; easily distracted; overly emotional (depressed, irritable); argumentative; lies; steals; aggressive towards peers/adults; poor social skills; and struggles to complete tasks. Parent also reported weight gain and emotional stress due to her grandfather's recent death. Her third-grade teachers reported concerns with social/emotional functioning including difficulty communicating emotions and becoming upset very easily. Brooklyn herself reported that she is overly emotional, often cries over nothing and feels sad given the pandemic restrictions.

28.     Testing to measure Brooklyn's cognitive functioning indicated a Low Average Full Scale Intelligence Quotient ("FSIQ"). Academic achievement tests revealed Below Average scores in the areas of areas of Math Concepts and Applications, Math Calculation, and Reading Comprehension. Brooklyn also demonstrated notable weakness in two math subtests focused on math reading comprehension and math problem-solving.

29.     Brooklyn's third-grade teacher, Parent, and Brooklyn filled out "rating scales." Brooklyn's third-grade teacher rated her in the At-Risk range for adaptability. Parent rated Brooklyn in the Clinically Significant or At-Risk range for Externalizing Problems; Hyperactivity; Aggression, Conduct Problems, Internalizing Problems; Anxiety, Depression, Somatization, Attention Problems, Atypicality, and all areas of Adaptive Skills. Brooklyn herself reported what the ER described as "high levels of maladjustment in a variety of areas within the internalizing composite as well as the inattention/hyperactivity composite."

30.     Specifically, Brooklyn rated herself in the At-Risk or Clinically Significant range for Attitude to School; Internalizing Problems; Atypicality; Locus of Control Social Stress; Anxiety; Depression; Sense of Inadequacy; Inattention/Hyperactivity; Attention Problems; Hyperactivity; and Emotional Symptoms Index.  More concerning, the results of Brooklyn's self-report on the Beck

Youth Inventories-II were as follows: Depression (Extremely Elevated); Anxiety (Moderately Elevated); Anger (Mildly Elevated); Disruptive Behavior (Mildly Elevated) and Self- Concept (Below Average).

31.     By demonstrating significant academic and social-emotional weaknesses, these data revealed clearly that Brooklyn required an IEP for her disabilities. Despite Brooklyn's well-documented academic difficulties, social-emotional struggles, and known mental health diagnoses, as well as these concerning sets of data, the District's December 2020 ER wrongly concluded that while she was indeed a student with a disability, she did not meet the IDEA's criteria for a Specific Learning Disability ("SLD") per the IDEA's criteria in any area.

32.     Instead, the District only provided a weak, ineffective, generic, and inadequate Section 504 Service Plan in January of 2021. The Plan acknowledged Brooklyn's diagnosis of Disruptive Mood Dysregulation Disorder and described her behaviors as "shutting down and crying." However, despite her notable challenges with emotional self-regulation, the Plan's supports offered were general, such as: positive praise; communication between school, home, and outside providers; and small group testing. It did not include a designated time to meet with the social worker/guidance counselor but instead required Brooklyn to ask to go for counseling if needed – even as the Plan itself recognized that one of her main areas of concern was "shutting down," that is, having difficulty reaching out, advocating for herself, and opening up to others. The 504 plan also included no direct instruction in coping skills, which the data showed Brooklyn desperately needed.

33.     While accepting the 504 Plan as better than nothing, Parent expressed her belief that Brooklyn needed the greater level of support that would be provided by an IEP.

34.     The Plan failed to meet Brooklyn's needs appropriately, and her struggles continued to increase. In February 2021, after the 504 Plan was put in place, Brooklyn had a severe meltdown

8

about a minor error she made during a virtual instruction session. Brooklyn cried, shut down, and called herself stupid. Parent again asked the District to develop an IEP.

35.     The District refused, adding negligible supports to her 504 Plan that made no difference. These were supposedly supports to assist Brooklyn to ask for and receive help. However, there was still no designated time included for Brooklyn to meet with the social worker and/or guidance counselor to discuss these challenges and work on self-regulation and self-advocacy. More intensive supports, in the form of an IEP, were neither considered nor discussed. Parent signed and returned the revised Plan in early March of 2021, writing that she agreed to the supports but continued to have concerns over the Plan's appropriateness, and believed Brooklyn needed an IEP. Brooklyn then had an even more severe meltdown.

36.     Thereafter, Parent filed a due process complaint. After a two-day evidentiary hearing that included expert testimony for the Family, Pennsylvania Due Process Hearing Officer Cheryl Cutrona partly granted and partly denied relief in a decision dated April 5, 2021. The decision was correct as to the inappropriateness of the 504 Plan but legally and factually erroneous in all other regards, including in the meagre amount of compensatory education awarded given the gravity of the deprivation of FAPE.

37.     The Family respectfully requests that the Court affirm as to the inappropriateness of the 504 Plan and the award of compensatory education (though not the insufficient amount), and in all other regards reverse Ms. Cutrona's decision, so as to find that: (1) the District violated its "Child Find" obligations under both the IDEA and Section 504; (2) the District failed to timely and comprehensively evaluate Brooklyn; and (3) the District inappropriately failed to identify Brooklyn as eligible for special education and an IEP under the IDEA, resulting in a denial of FAPE. The Family also respectfully requests the award of a fair and appropriate amount of compensatory education.

## V.      **Statutory Authority**

38.      The IDEA provides that an aggrieved party has the right to bring a civil action in federal district court, which conducts an independent review of the administrative record and any additional evidence presented by the parties. *Shore Regional High School Bd. of Educ. v. P.S.*, 381 F.3d 194, 198 (3d Cir. 2004); 20 U.S.C. § 1415(i)(2); 34 C.F.R. § 300.516(c)(3).

39.      The purpose of the IDEA is to ensure that "all children with disabilities have available to them a [FAPE] that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A); *Endrew F. v. Douglas County School Dist. RE-1*, 137 S. Ct. 988 (2017).

40.      IDEA and the regulations thereunder, 34 C.F.R. §§ 300.100 *et seq.*, and 22 Pa. Code Chapter 14, require that public school districts provide disabled children with a FAPE as well as extensive due process procedures to effectuate that right:

> The IDEA protects the rights of disabled children by mandating that public educational institutions identify and effectively educate those children or pay for their education elsewhere if they require specialized services that the public institution cannot provide. Accordingly, schools must: (1) identify children in need of special education services (Child Find); and (2) provide a FAPE to disabled students.

*D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 244 (3d. Cir. 2012) (internal citation and quotation omitted).

41.      The requirement that school districts properly identify all eligible children is known as Child Find and is mandated under both IDEA and Section 504. 34 C.F.R. Sections 104.33 and 300.111; 20 U.S.C § 1412(a)(3)(A) and (B). *See PARC v. Cmwlth.*, 343 F.Supp. 279 (E.D. Pa. 1972); *E.P. by & through Allison H.-P. v. Twin Valley Sch. Dist.*, 517 F. Supp. 3d 347 (E.D. Pa. 2021) (Rice, M.J., sitting by designation). Under these statutes and their regulations, school districts have a

continuing obligation to properly evaluate and accurately identify all students who are reasonably suspected of having a disability. *Ridley Sch. Dist. v. M.R.*, 680 F.3d. 260 (3d Cir. 2012); *Ridgewood Board of Education v. N.E.*, 172 F.3d 238 (3d Cir. 1999). A district's Child Find obligations are triggered when there is a reason to suspect that the child may be disabled, and "a poorly designed and ineffective round of testing does not satisfy a school's Child Find obligation." *D.K. v. Abington Sch Dist.*, 696 F.3d at 250 (citing *G.D. ex rel. G.D. v. Wissahickon Sch. Dist.*, 832 F.Supp.2d 455, 465– 67 (E.D. Pa. 2011) (finding the school's reevaluation of an elementary student with significant behavioral problems was inadequate because it overemphasized academic proficiency and assessed behavioral issues only cursorily). A District must identify and evaluate a child suspected of having a qualifying disability "within a reasonable time after school officials are on notice of behavior that is likely to indicate a disability." *W.B. v. Matula*, 67 F.3d 484, 501 (3d Cir 1995), *abrogated on other grounds, A.W. v. Jersey City Public Schools*, 486 F. 3d 791 (3d Cir. 2007).

42.     "[A] poorly designed and ineffective round of testing does not satisfy a school's Child Find obligation." *D.K. v. Abington Sch Dist.*, 696 F.3d at 250 (citing *G.D. ex rel. G.D. v. Wissahickon Sch. Dist.*, 832 F.Supp.2d 455, 465–67 (E.D. Pa. 2011) (finding the school's reevaluation of an elementary student with significant behavioral problems was inadequate because it overemphasized academic proficiency and assessed behavioral issues only cursorily). Failing to meet Child Find requirements under both IDEA and Section 504 is a matter of serious concern that can deprive FAPE to a student who should have been identified, entitling him or her to an appropriate remedy (e.g., compensatory education, tuition reimbursement, etc.) accruing from the time the district first should have suspected the disability. *Forest Grove School Dist. v. T.A.*, 557 U.S. 230 (2009); *Ridgewood*; *E.P.*, 517 F. Supp. 3d 347.

43.     The mechanism employed to provide FAPE under the IDEA is the IEP. 20 U.S.C. §

1412(4). A FAPE must be provided "under public supervision and direction, ... meet the standards of the State educational agency, ... include an appropriate preschool, elementary school, or secondary school education in the State involved … [and must be provided at] no cost to Parent." *Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 524-25 (2007) (citing 20 U.S.C. § 1401(9) and (29)).

44.     Education extends beyond discrete academic skills, and includes social, emotional, and behavioral domains. *S.H. v. State-Operated School Dist. of the City of Newark*, 336 F.3d 260, 265 (3d Cir. 2003). A student's educational program must be judged by whether it is reasonably calculated to enable the child to receive meaningful educational benefit considering the child's *particular* circumstances, including the *social, emotional, behavioral, and physical* progress necessary to move the child towards independence and self-sufficiency consistent with the child's cognitive potential. *Endrew F.*, 137 S.Ct. at 1001; *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 557 (3d Cir. 2010).

45.     IDEA requires school districts to offer an IEP for each child with a disability who resides within its jurisdiction by the beginning of each school year. 20 U.S.C. § 1414(d)(2)(A); 34 C.F.R. § 300.323(a); *L.T. v. North Penn School Dist.*, 342 F.Supp.3d 610, 616 (E.D. Pa. 2018).

46.     A school district has an obligation to reevaluate all children residing in the district known to be eligible under the IDEA and to develop an IEP when a parent either: (1) enrolls an eligible child in the district of residence after a period of absence; *or* (2) requests that the district evaluate and/or offer the family a proposed IEP. *Id.*, 342 F.Supp.3d at 619; *Shane T. v. Carbondale Area Sch. Dist.*, 2017 WL 4314555 (M.D. Pa. 2017).

47.s     Section 504 states, in part: "No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination

under any program or activity receiving Federal financial assistance...." 29 U.S.C. § 794.[1]

48.     Regulations implementing Section 504 require public schools to provide a FAPE to each qualified disabled student regardless of the nature or severity of his or her disability. 34 C.F.R. §§ 104.33(a), 104.33(b)(1); *E.P.*, 517 F. Supp. 3d 347. Under Section 504, FAPE is defined as "the provision of regular or special education and related aids and services that (i) are designed to meet individual educational needs of handicapped persons *as adequately as* the needs of nonhandicapped persons are met and (ii) are based upon adherence to procedures that satisfy the requirements of §§ 104.34, 104.35, and 104.36." 34 C.F.R. § 104.33(b)(1) (emphasis added). Thus, provision of FAPE under Section 504 is based in non-discrimination and equal access to educational benefits.

49.     The substantive requirements of Section 504 in the education context are somewhat equivalent to, and somewhat different from, the requirements under the IDEA. *James S. v. School Dist. of Phila.*, 559 F. Supp.2d 600, 620 (E.D. Pa. 2008) (citing *Molly L. v. Lower Merion School Dist.*, 194 F. Supp.2d 422, 426 (E.D. Pa. 2002)).

50.     While under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.,* only students with 13 specifically defined categories of disability are eligible, Section 504/Chapter 15 defines disability more broadly. The Chapter 15/Section 504/ADA analysis focuses on "a physical or mental impairment that substantially limits one or more major life activities," 42 U.S.C. § 12102(1) and 22 Pa. Code § 15.2, which, here, included multiple diagnoses including Disruptive Mood Dysregulation Disorder, Other Specified Depressive Disorder, and Specific

---

[1] Pennsylvania implements the statutory and regulatory requirements of Section 504 at the state level through the enactment of Chapter 15 of the Pennsylvania Code, 22 Pa. Code § 15 et seq. ("Chapter 15"). Chapter 15 neither preempts not expands the rights and liabilities under Section 504, and therefore courts treat Chapter 15 as coextensive with Section 504. *See K.K. ex rel. L.K. v. Pittsburgh Pub. Schs.*, 590 Fed. Appx. 148, n.3 (3d Cir. 2014). The violations of Section 504 described here are therefore also violations of Chapter 15.

Learning Disabilities in reading as well as mathematics.[2] *E.P.,* 517 F. Supp. 3d 347.

51.     A school may violate Section 504 independent of any violations of IDEA. *Id.*; *Lauren G. v. West Chester Area School Dist.*, 906 F.Supp.2d 375 (E.D. Pa. 2012) (granting tuition reimbursement for school district's failure to provide FAPE under Section 504 during period for which court found IDEA did not warrant relief).

52.     Section 504 also requires districts to provide disabled students a FAPE as part of Section 504's prohibition of discrimination. *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 253 (3d Cir. 2012) ("As under the IDEA, providing a FAPE in accordance with § 504 requires a school district to reasonably accommodate the needs of the handicapped child so as to ensure meaningful participation in educational activities and meaningful access to educational benefits.") (internal quotation marks omitted); *E.P.*, 517 F. Supp. 3d 347.

53.     Section 504 further contains its own Child Find requirement, namely that "a public elementary or secondary education program shall annually undertake to identify and locate every qualified handicapped person residing in the recipient's jurisdiction who is not receiving a public education and take appropriate steps to notify handicapped persons and their parents or guardians of the recipient's duty under this subpart." 34 C.F.R. §§ 104.32, 104.33, 300.111; *Ridgewood*, 172 F.3d at 253; *W.B. v. Matula*, 67 F.3d at 492. *Centennial School Dist. v. Phil L.*, 799 F. Supp.2d 473, 488-89 (E.D. Pa. 2011).

54.     Failing to meet Child Find requirements of either IDEA or Section 504 is a serious

---

[2] Section 504 and Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, are interrelated. *See* 28 C.F.R. § 35.108 (a)(2)(i) (Section 504 regulation) ("The definition of 'disability' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA"). Section 504 looks to 29 U.S.C. § 705(20) for its definition of individual with a disability: "any person who has a disability as defined in section 12102 of Title 42 [the ADA]." 29 U.S.C. § 705(20)(B). *See E.P.*

matter involving a substantive violation of IDEA and Section 504, since no appropriate educational plan can be developed/offered absent a proper, fully comprehensive evaluation. *Zakary M. by Donna M. v. Chester County Intermediate Unit*, 1995 WL 739708 (E.D. Pa. 1995). It can deprive FAPE to a student whom the District should have identified as disabled, entitling her to an appropriate equitable remedy (e.g., compensatory education) accruing from the time the District should first have suspected the disability. *Forest Grove*; *Ridgewood*.

55.   The District must thus timely identify and evaluate all children it has reason to suspect might have a disability within the broader Section 504 definition. *See E.P.*, 517 F. Supp. 3d 347. The District must also ensure that its evaluations to determine eligibility for services occur within a *reasonable time* after school officials know or should reasonably have known that the child is likely to have a disability. *Id.*; *Matula* at 501; *L.T. ex rel. B.T. v. Mansfield Twp. Sch. Dist.*, No. CIV.A.04-1381(NLH), 2009 WL 737108, at *7 (D.N.J. Mar. 17, 2009) (finding, in Section 504 context: "waiting until after the start of the school year to even contemplate the development of an educational plan[] constitutes reckless disregard of the school district's duty to provide B.T. with a free appropriate education. Moreover, the fact that the development of his educational plan was not undertaken until after the school year began, and only after the parent [contacted school], demonstrates that Defendant acted with deliberate indifference to B.T.'s right to his education.").

56.   To establish a violation of Section 504, a plaintiff must prove that: (1) she is "disabled" as defined by the Act; (2) she is "otherwise qualified" to participate in school activities; (3) the school or the board of education receives federal financial assistance; and (4) she was excluded from participation in, denied the benefits of, or subject to discrimination at, the school. *Ridgewood*,172 F.3d at 253. Only element four was at issue here.

57.   When a District denies a disabled child FAPE, it violates element four. *Phil L.*,799 F.

Supp. 2d at 489 (discussing *Andrew M. v. Delaware Cty. Office of Mental Health & Mental Retardation*, 490 F.3d 337, 350 (3d Cir. 2007)). Parents must also demonstrate that a district knew or should reasonably have known of the child's disability, but to establish a denial of FAPE, Parents need *not* prove that the district's allegedly discriminatory acts were intentional, only that it denied FAPE. *Phil L.*, 799 F. Supp. 2d at 481.

58.     An individual with a disability is a person with a physical or mental impairment that *substantially limits one or more of such person's major life activities*, or a record of such impairment, *or being regarded as* having such an impairment. 42 U.S.C. § 12102(1). Major life activities are very broadly defined and include but are not limited to caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working. Id. at 12102(2).

59.     Per the Americans with Disabilities Act Amendments Act ("ADAAA"), effective in 2009, "major life activities" under 42 U.S.C. § 12102(1) are now very broadly defined in a non-exclusive list; these include but are not limited to caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, *learning,* reading, concentrating, thinking, communicating, and working. 42 U.S.C. § 12102(2) (2008, effective 1/1/09) (emphasis added).  ADAAA implementing regulations define an "impairment" as any physiological, medical, or psychological condition that "substantially limits one or more of the major life activities." 28 C.F.R. § 35.108(a)(1)(i). One such activity is "interacting with others." Id., § 35.108(c)(1)(ii). *See Weidow v. Scranton Sch. Dist.*, 460 Fed. Appx. 181 (3d Cir. 2012) (recognizing social interaction as major life activity).

60.     It cannot possibly be disputed, in light of this, that socializing and building relationships are major life activities under the ADA. *Aponte v. Rosa-Bell*, 2019 WL 8329333 (D.P.R.,

Mar. 31, 2019) (rejecting Report and Recommendation in part based on its failure to recognize that ADAAA changed previous law that socializing is not a "major life activity" for ADA purposes); Perry A. Zirkel, Ph.D., J.D., LL.M., *An Update of Legal Issues for Students with Autism: Eligibility and Methodology*, 376 Ed. Law Rep. 1, 46 n.13 (2020) ("The ADA Amendments, which are effective January 1, 2009, effectively reverse a decade of court decisions that have taken a 'demanding' and, thus, narrowing interpretation of this definition [of major life activity]."); *Bialko v. Quaker Oats Co.*, 434 Fed. Appx. 139, 142 (3d Cir. 2011) (hypothetically treating thinking, concentrating, and socializing as major life activities under the ADAAA).

61.     Brooklyn has such impairments. But even if she was only regarded by others as having them – which she certainly was – that indisputably qualified her for the protections of the ADA from the very start, not just from the time the District developed its Section 504 Plan. *See* 28 C.F.R. § 36.105; 34 C.F.R. §§ 104.31-104.36.

62.     "When a state fails to provide a disabled child with a free and appropriate education, it violates the IDEA. However, it also violates [Section 504] because it is denying a disabled child a guaranteed education merely because of the child's disability. It is the denial of an education that is guaranteed to all children that forms the basis of the claim." *Andrew M.*, 490 F.3d at 350 (emphasis added). This is clearly a form of discrimination.

## VI.   <u>THE HEARING OFFICER'S ERRORS</u>

63.     Pursuant to the above standards, the District failed in its statutory duties to Brooklyn under both the IDEA and Section 504. Ms. Cutrona erred in ruling otherwise as to the IDEA entirely, and in ruling only partially for the Family under 504, as well as in failing to award more than a negligible amount of compensatory education as relief.

64.     Although correct regarding the inappropriateness of the 504 Plan, the Hearing Officer erred in finding that it was timely, as well as in failing to find that: (1) the District violated its "Child Find" obligations under both the IDEA and Section 504 by failing to timely and comprehensively evaluate Brooklyn; and (2) the District inappropriately failed to identify Brooklyn as eligible for special education and an IEP under the IDEA, resulting in a denial of FAPE.

### A. The Hearing Officer Erred by Failing to Find that the District Denied Brooklyn a FAPE by Violating Its Child Find Obligations Under Both IDEA and Section 504 in Not Timely and Comprehensively Evaluating and Identifying Brooklyn.

65.     The Hearing Officer wrongly concluded that even though the District failed to comprehensively evaluate Brooklyn in her kindergarten year, when it should have, it did not violate its child-find obligations under the IDEA, because when it completed a more thorough evaluation four years later in her fourth-grade year, it concluded that Brooklyn was not eligible under the IDEA. The Hearing Officer's conclusion in this regard is contrary to the law and to the facts in this matter.

66.     Hearing Officer Cutrona further failed to analyze or discuss the Family's separate and distinct Section 504 child-find claim, erroneously conflating Section 504 and IDEA's child-find requirements. In her analysis, because the District met its IDEA child-find obligation, it had therefore met its 504 obligations. That, however, is contrary to both statutes. Moreover, in the 504 context, once the District had completed its four-year-late albeit more comprehensive evaluation, it determined Brooklyn eligible under 504, something it should have done years earlier.

67.     The District was on notice that Brooklyn might be in need of special education due to her academic and social-emotional struggles since she was in kindergarten in the 2016-17 school year. It failed to meet its child-find obligations to timely undertake a thorough and comprehensive evaluation, assessing all areas of potential need and to determine her eligibility under IDEA and/or Section 504. Year after year, the District's own curriculum and benchmark assessments showed

significant academic deficits in reading, math, and written expression, yet the District failed to respond in any meaningful way.

68.     Similarly, despite increasing social-emotional difficulties from year to year, the District did nothing. At no point in time has the District completed a thorough and comprehensive evaluation of Brooklyn. Moreover, the District failed to evaluate and identify Brooklyn under Section 504 until the middle of fourth grade. The District has to this day failed to identify Brooklyn under the IDEA and to provide her with an appropriate program and placement.

69.     While the District never initiated a thorough and comprehensive evaluation on its own during the time period in question, the Parent did request such an evaluation as early as the middle of kindergarten. However, contrary to the requirements of both IDEA and Section 504, the District wrongly denied the Parent's request despite Brooklyn's poor school performance, and instead inappropriately limited its evaluation of Brooklyn to speech and language testing only.

70.     The District's decision to inappropriately limit its evaluation to speech and language testing only rendered the resulting 2017 ER – which ultimately found Brooklyn eligible for speech and language services, but failed to assess and identify her other significant needs – inappropriate and therefore insufficient to meet its child-find obligation. *D.K. v. Abington Sch Dist.*, 696 F.3d at 250.

71.     The District had another opportunity to remedy its earlier failure to appropriately evaluate Brooklyn when it conducted a reevaluation in February of 2019. Sadly, however, despite Brooklyn's ongoing academic and social-emotional issues at the time, including suicidal ideation and diagnosed Other Specified Depressive Disorder, the District again failed to evaluate her academic and social-emotional needs, inappropriately limiting the reevaluation to speech and language testing in order to exit Brooklyn from services.

72.     Parent's expert, Holly Cohen – a licensed and certified school psychologist with years

19

of experience both as a school district psychologist and as a private psychologist – concluded in her expert report that the District's ER data should have led to a diagnosis Brooklyn with SLD in both reading and math, and she so testified. However, Ms. Cutrona did not in any way analyze SLD in reading, only math. The omission is egregious, and her conclusion as to math is plainly erroneous.

73.      Ms. Cohen also testified that Brooklyn's increase in academic struggles over the years is due to the increased impact of her disability on her ability to respond to the increases in academic demands as she rose from grade to grade.

74.      Ms. Cutrona has already found that the District denied FAPE in its inappropriate Section 504 Plan after it was developed, satisfying the fourth and only element at issue in the four-prong Section 504 FAPE test; however, she should also have found element four satisfied well before that, from the beginning of the period at issue.

75.      Brooklyn's social-emotional issues clearly occurred in and impacted Brooklyn at school beginning as early as kindergarten, when her classroom teacher noted her difficulties with focus and that she became "tearful when she doesn't get her way." Brooklyn's third-grade teachers noted similar social-emotional concerns, including low self-confidence, getting into arguments with other students, becoming easily upset, and crying if a task was difficult or if she was asked to stop a preferred activity. One teacher was so concerned that she contacted Parent and ultimately referred Brooklyn for counseling with the social worker. Brooklyn herself said she has significant issues with her attitude toward school, internalizing problems, social stress, anxiety, depression, sense of inadequacy, and attention problems.

76.      To the extent that Brooklyn did have troubling behaviors at home – even if most or all of these behaviors were at home, which is not the case here – the District was still obligated to evaluate and address those behaviors under 504 and the IDEA. *E.P.*, 517 F. Supp. 3d 347. As Parent's expert,

Ms. Cohen, testified, it is not uncommon for a student with disabilities like Brooklyn to be able to keep things in check at school and then decompensate at home. Just because behaviors occur at home does not mean they are not related to school or that they do not need to be evaluated and/or addressed by the District. In Brooklyn's case, her behaviors and social-emotional issues at home were typically related to school. In fact, according to Ms. Cohen, it was imperative for the District to consider those home behaviors.

77.     The law reflects that obligation as well. Generalization refers to the transferring of skills learned in one environment to another. *M.C. on Behalf of J.C. v. Cent. Reg. Sch. Dist.*, 81 F.3d 389, 394 (3d Cir. 1996). Sometimes a student's disabilities, or efforts to hide disabilities, can interfere with the student's generalization as so defined, so that skills possibly "learned" at school do not transfer to home, or vice versa; if signs of disabilities are more apparent at home but not at school, that can indicate a failure of generalization and that the student has been denied meaningful educational benefit. *See New Milford Bd. of Educ. v. C.R.*, 431 Fed. Appx. 157, 159-60 (3d Cir. 2011); *E.P.*, 517 F. Supp. 3d 347; *Gerstmyer v. Howard County Public Schools*, 850 F. Supp. 361 (D. Md. 1994). As those cases demonstrate, it can appear as if the student is fine at school, with no disabilities whatsoever, or even intellectually gifted, as in *E.P.*, while the student decompensates at home regarding the extra effort needed at school to hide the disabilities that the student feels comfortable being honest about at home. The District is and was obliged to consider home behaviors, as Ms. Cohen testified.

78.     The evidence presented at the hearing clearly and overwhelmingly demonstrated that the District failed to meet its child-find obligations under both IDEA and Section 504, and as such, denied Brooklyn a FAPE under IDEA during the entire period at issue, entitling her to compensatory education under IDEA, and to a greater amount of compensatory education than Ms. Cutrona awarded

under Section 504. *See Forest Grove*, 557 U.S. 230.

**B. The Hearing Officer Erred by Not Finding that the District Inappropriately Failed to Identify Brooklyn as Eligible Under the IDEA, Resulting in a Denial of FAPE.**

79.     The District's December 4, 2020 ER was untimely and inadequate in its scope and depth, but it revealed significant academic and social-emotional weaknesses. However, the District and the Hearing Officer incorrectly found Brooklyn ineligible under the IDEA. To be eligible for services under the IDEA, a student must meet the requirements of one or more of the disability categories enumerated in the regulations, and by reason thereof require specially designed instruction. 34 C.F.R. §§ 300.8 and 300.306. The District's own evaluation demonstrates Brooklyn meets the criteria under the reading and math classifications of SLD, as Parent's expert testified and stated in her report.

80.     The IDEA generally defines a SLD as ". . .a disorder in one or more of the basic psychological processes involved in understanding or in using language, spoken or written, that may manifest itself in the imperfect ability to listen, think, speak, read, write, spell, or to do mathematical calculations, including conditions such as perceptual disabilities, brain injury, minimal brain dysfunction, dyslexia, and developmental aphasia." 34 C.F.R. § 300.8(c)(10). The regulations go on to explain the criteria for determining the presence of an SLD as follows:

> The child does not achieve adequately for the child's age or to meet State-approved grade-level standards in one or more of the following areas, when provided with learning experiences and instruction appropriate for the child's age or State-approved grade-level standards:
> (i) Oral expression.
> (ii) Listening comprehension.
> (iii) Written expression.
> (iv) Basic reading skill.
> (v) Reading fluency skills.
> (vi) Reading comprehension.
> (vii) Mathematics calculation.
> (viii) Mathematics problem solving.

34 C.F.R. § 300.309(a)(1). In other words, as the District's school psychologist acknowledged, one looks for a significant discrepancy between the Student's intellectual ability and academic achievement in one of the above eight areas, as demonstrated on standardized testing.

81.     In the present matter, the District and Ms. Cutrona ultimately concluded that Brooklyn does not have an SLD, as Brooklyn's overall average to low average intellectual functioning was commensurate with her average academic performance on standardized testing. The District's and Ms. Cutrona's conclusions in this regard are simply not supported by the testing.

82.     The Family ultimately obtained its own highly qualified expert in school psychology and special education, Holly Cohen, to review Brooklyn's records, including the District's evaluation and underlying data, and to offer an opinion based on that testing as to whether Brooklyn is eligible for services. Following her review of Brooklyn's records and the District's December 2020 ER, Ms. Cohen correctly concluded that the District's analysis of Brooklyn's eligibility was flawed.

83.     Specifically, and contrary to Ms. Cutrona's conclusions, Ms. Cohen explained that it is necessary to first consider the significant discrepancy among Brooklyn's subtests within the different composite indices. While the District's school psychologist tried to claim that no discrepancies existed, Ms. Cohen rightly explained that Brooklyn's subtest scores were discrepant.

84.     Further, directly contrary to the District psychologist's testimony, standardized testing administered by the District as part of the ER shows sub-average performance on multiple subtests.

85.     Given Brooklyn's particularly low performance in reading and math, the District administered two additional subtests – in Reading Comprehension and Math Problem Solving – in hopes of a better performance. However, Brooklyn still performed Below Average on Math Problem Solving.

86.     Moreover, Ms. Cohen noted that District records and testing revealed Brooklyn's

23

academic struggles had caused significant social-emotional distress that must also be addressed by her IEP, although she did not believe it was necessary at that time to add as a second area of IDEA classification. In its ER, however, the District attempted to minimize and dismiss Brooklyn's very real social-emotional struggles.

87.     Ms. Cohen correctly concluded that, based on the District's own testing and records, Brooklyn should have been identified as eligible under the IDEA, under the classification of SLD in reading and math, and should have been provided with an IEP to provide specially designed instruction ("SDI") to address her deficits in reading comprehension and math concepts and application, as well as her social-emotional needs directly related to school and her academic struggles.

88.     Accordingly, Brooklyn is entitled to compensatory education for the time period at issue and until such time as an appropriate IEP is developed.

89.     Section 504 and the IDEA permit recovery of reasonable attorneys' fees by parents who prevail in an action or proceeding thereunder.  20 U.S.C. § 1415(i)(3)(B); 34 C.F.R. § 300.517; 29 U.S.C. § 794a; *Andrew M. v. Delaware County Office of Mental Health/Mental Retardation*, 2005 WL 783070 at *15 (E.D. Pa. 2005) (attorneys' fees are recoverable under Section 504); *Daniel S. v. Scranton School Dist.*, 230 F.3d 90, 95 (3d Cir. 2000) (attorneys' fees are recoverable under IDEA).

90.     Section 504 additionally permits other costs, including expert witness fees. *L.T. v. Mansfield Twp. School Dist.*, 2009 WL 248818139 at *2 (D.N.J. Aug. 11, 2009) ("plaintiffs are entitled to reimbursement of their expert fees for their prevailing party status on their Rehabilitation Act claim"). Plaintiffs seek such costs in this matter, including expert costs.

91.     Plaintiffs were the prevailing parties in the due process proceedings as to Section 504 and are therefore, at a minimum, entitled to an award of reasonable attorneys' fees and costs, including

expert costs. Plaintiffs further expect to prevail under IDEA and in the present proceeding, thereby entitling Plaintiffs to a further award of statutory attorneys' fees and costs, including for the present proceeding.

## VII.   CONCLUSION

**WHEREFORE**, the Plaintiffs respectfully request that this Court:

1.   Assume jurisdiction over this action;

2.   Affirm the Hearing Officer's Decision to the extent that it finds that the District denied FAPE by providing an inappropriate Section 504 Plan;

3.   Affirm the Decision to the extent that it awarded compensatory education for the District's denial of FAPE under Section 504, but reverse regarding the amount, which should have been greater;

4.   Reverse the Decision's conclusion that the District provided a 504 Plan in a timely manner;

5.   Reverse the Decision to the extent that it concluded that the District did not violate Child Find under Section 504 or the IDEA;

6.   Reverse the Decision's finding that it concluded that the District did not violate deny FAPE under IDEA;

7.   Order the District to compensatory education for the District's past violations and until such time as the District offers FAPE;

8.   Declare the Defendant's actions and omissions to be violative of IDEA, Section 504, and Pennsylvania law;

9.   Award the Family prevailing-party attorneys' fees and costs, both as the already-prevailing party to the extent ordered by the Hearing Officer, including expert costs under

504, and in anticipation of further relief; and

10.    Grant such other relief as this Court deems proper.

Respectfully submitted,

D. Daniel Woody, Esquire
ID No. 309121

Michael J. Connolly, Esquire
ID No. 82065

Dennis C. McAndrews, Esquire
ID No. 28012

McANDREWS, MEHALICK, CONNOLLY,
HULSE & RYAN, P.C.
30 Cassatt Avenue
Berwyn, PA 19312
(610) 648-9300 (phone)
(610) 648-0433 (fax)
Attorneys for Plaintiffs