**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| BROOKLYN S.-M., *through her parent, Gabrielle M.*, | : | |
| | : | |
| | : | |
| Plaintiffs, | : | CIVIL ACTION |
| | : | No. 21-5164 |
| v. | : | |
| | | |
| UPPER DARBY SCHOOL DISTRICT, | : | |
| | : | |
| | : | |
| Defendant. | : | |

**March 3, 2023**                                                     **Anita B. Brody, J.**


**<u>Memorandum</u>[1]**

Plaintiffs Brooklyn S.-M. ("Brooklyn"), through her parent, Gabrielle M. ("Parent"),

brings this action against Defendant Upper Darby School District ("District"). Plaintiffs allege

that the District failed to provide Brooklyn with a free appropriate public education ("FAPE") in

violation of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq.*,

and Section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 794. Plaintiffs' claims were

initially reviewed and adjudicated by a hearing officer, Cheryl Cutrona ("Hearing Officer"). The

Hearing Officer granted Plaintiffs relief on some of Plaintiffs' claims, and denied relief on the

remaining claims.

Before me is Plaintiffs' motion for judgment on the administrative record. I exercise

jurisdiction to review the Hearing Officer's decision under 20 U.S.C. § 1415(i)(2). For the

---

[1] Because of the many abbreviations referenced in this memorandum, a glossary of abbreviations
is attached as Appendix A.

reasons set forth below, I will deny the motion.

## I.   BACKGROUND

### A.  Brief Overview of the IDEA and Section 504

"The IDEA protects the rights of disabled children by mandating that public educational institutions identify and effectively educate those children, or pay for their education elsewhere if they require specialized services that the public institution cannot provide." *P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 735 (3d Cir. 2009). The IDEA provides that all states receiving federal education funding must guarantee all children with disabilities a FAPE. 20 U.S.C. § 1412(a)(1). A FAPE "consists of educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 188-89 (1982). An Individualized Education Program ("IEP") is "the primary mechanism for delivering a FAPE." *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 269 (3d Cir. 2012) (internal quotation marks omitted).

While the IDEA requires states receiving federal funding to provide a FAPE to all disabled children residing within the state, 20 U.S.C. § 1412(a)(1), Section 504 of the RA prohibits discrimination on the basis of disability in federally funded programs, 29 U.S.C. § 794(a). The Third Circuit has "held that there are few differences, if any, between IDEA's affirmative duty and § 504's negative prohibition and ha[s] noted that the regulations implementing § 504 require that school districts provide a free appropriate education to each qualified handicapped person in its jurisdiction."[2] *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*,

---

[2] Although the IDEA and Rehabilitation Act overlap significantly, the Rehabilitation Act is broader in scope:

172 F.3d 238, 253 (3d Cir. 1999)  (internal quotation marks omitted), *superseded by statute on other grounds as recognized by P.P.*, 585 F.3d 727. "[C]ase law makes clear that a party may use the same conduct as the basis for claims under the IDEA and the RA." *Andrew M. v. Del. Cnty. Office of Mental Health & Mental Retardation*, 490 F.3d 337, 349 (3d Cir. 2007). "Therefore, when a state fails to provide a disabled child with a free and appropriate public education, it violates the IDEA. However, it also violates the RA because it is denying a disabled child a guaranteed education merely because of the child's disability."[3] *Id.* at 350.

"To the extent a school district fails to provide a student with a FAPE, a parent may file a

---

[I]t is well recognized that Section 504 covers more students than does the IDEA. Students with disabilities who are eligible for services under IDEA are also covered by the prohibitions against discrimination on the basis of disability in Section 504 and its implementing regulation at 34 CFR Part 104, but students covered only by Section 504 are not entitled to the rights and protections enumerated by IDEA and its implementing regulations at 34 CFR Part 300.

*Molly L. ex rel. B.L. v. Lower Merion Sch. Dist.*, 194 F.Supp.2d 422, 427 n.3 (E.D. Pa. 2002) (DuBois, J.) (internal quotation marks omitted).

[3] A violation of the IDEA is not a per se violation of the RA.  *Andrew,* 490 F.3d at 349-50.  To prevail on a Section 504 claim, a plaintiff must prove:

(1) [H]e is "disabled" as defined by the Act; (2) he is "otherwise qualified" to participate in school activities; (3) the school or the board of education receives federal financial assistance; and (4) he was excluded from participation in, denied the benefits of, or subject to discrimination at, the school.  In addition, the plaintiff must demonstrate that defendants know or should be reasonably expected to know of his disability.

*Ridgewood*, 172 F.3d at 253 (citations omitted).  Denial of a FAPE satisfies prong four because "[i]t is the denial of an education that is guaranteed to all children that forms the basis of the claim."  *Andrew*, 490 F.3d at 350; *see also Centennial Sch. Dist. v. Phil L. ex rel. Matthew L.*, 799 F.Supp.2d 473, 489 (E.D. Pa. 2011) (Robreno, J.) ("Parents are correct in asserting that they can establish that [the student] was denied a benefit to which all other students were entitled simply on the basis that [the student] was disabled if they can establish a denial of a FAPE.").

due process complaint on behalf of his or her child, with a subsequent hearing held before an administrative hearing officer." *G.L. v. Ligonier Valley Sch. Dist. Auth*., 802 F.3d 601, 608 (3d Cir. 2015) (citing 20 U.S.C. §§ 1415(b)(6), (f)(1)(A)). "A party dissatisfied with the result of that hearing may then file an action in state or federal court." *Id.* (citing 20 U.S.C. § 1415(i)(2)).

### B.   Factual Background[4]

#### 1.   Brooklyn's Academic Development and the District's Actions

##### a)   The 2017-2019 IEP

Brooklyn is a minor child who has attended school in the District since 2016. F.F. ¶ 1. In 2017, during Brooklyn's kindergarten year, the Parent requested that the District conduct a full psychoeducational evaluation of Brooklyn. *Id.* On February 3, 2017, the District sent the Parent a Permission to Evaluate ("PTE") form. *Id.* The PTE indicated that the District would conduct a speech and language evaluation, but had decided not to conduct a full psychoeducational evaluation based on Brooklyn's satisfactory academic performance, including her Dynamic Indicators of Basic Early Literacy Skills scores. *Id.*; P-1. The Parent consented to the speech and language evaluation. F.F. ¶ 1; P-1; S-1. The evaluation concluded that Brooklyn was eligible for specially designed instruction under the IDEA disability category of Speech or Language

---

[4]     When a district court reviews a state agency's decision under the IDEA, "[f]actual findings from the administrative proceedings are to be considered prima facie correct." *S.H. v. State-Operated Sch. Dist. of Newark*, 336 F.3d 260, 270 (3d Cir. 2003).  A district court must defer to the state agency's credibility judgments and factual findings unless it can point "to contrary nontestimonial, extrinsic evidence on the record" that justifies a contrary conclusion. *Id*.  Accordingly, the facts presented here are primarily based upon the Findings of Fact in the Hearing Officer's Decision.  Any facts presented that are not based on the Hearing Officer's Findings of Fact come from the administrative record.

    "F.F." refers to the Findings of Fact in the Hearing Officer's decision.  "H.O.D." refers to the Discussion and Conclusions of Law in the Hearing Officer's decision.  Administrative record citations conform to the exhibits as entered during the Due Process Hearing. "S" denotes a School District Exhibit, and "P" denotes a Parent exhibit. "N.T." refers to the Notes of Testimony from the underlying due process hearing.

Impairment, and the District implemented an IEP. F.F. ¶ 2. The IEP provided that Brooklyn would receive speech and language therapy once a week for thirty minutes. *Id.* Brooklyn received therapy in accordance with the IEP through her first-grade year and most of second grade. *Id.*

In early 2019, the District reevaluated Brooklyn to determine whether she was making progress towards her IEP goals. In its March 19, 2019 Reevaluation Report, the District concluded that Brooklyn had achieved her IEP goals with minimal clinician support, and no longer demonstrated a speech or language impairment. F.F. ¶ 4. The reevaluation team recommended that Brooklyn exit special education, and the Parent approved the recommendation. *Id.*; P-5 at 23.

### b) Brooklyn's Behavioral and Emotional Difficulties and the District's Response

Around the same time, on February 18, 2019, Brooklyn was evaluated by a behavioral health provider after she expressed suicidal ideation during an annual checkup with her family physician. F.F. ¶ 3. Brooklyn was diagnosed with "Other Specified Depressive Disorder," and began participating in therapy. *Id.* It is unclear whether, and to what extent, this diagnosis was shared with the District.[5] On July 16, 2019, the Parent discontinued therapy because the therapist's availability was limited, and the therapy session times conflicted with Brooklyn's extracurricular activities. *Id.*; N.T. at 57-58. On October 5, 2019, during her third-grade year, Brooklyn was referred to a school social worker at the Parent's request because she "ha[d] been getting very upset often and at random times and then w[ould] begin to cry." F.F. ¶ 14; P-8.[6] [7]

---

[5] *See infra* pp. 19-20.

[6] The Findings of Fact incorrectly date this referral to November 5 instead of October 5. *See* P-8.

[7] It is not clear from the Hearing Officer's findings how often Brooklyn saw the social worker following her referral. Her third-grade teacher recalled Brooklyn seeing the social worker at least

In October 2020, during her fourth-grade year, Brooklyn was evaluated by a psychologist at Gemma Services, a community-based mental health program. F.F. ¶ 6; P-7. The psychologist conducted a psychosocial evaluation that resulted in a diagnosis of Disruptive Mood Dysregulation Disorder. F.F. ¶ 6; P-6 at 2; P-7 at 6. The evaluation contained a recommendation that Brooklyn receive ten hours per month of therapy. *Id.* Brooklyn began therapy in November 2020. *Id.*

Also in October 2020, the Parent requested that the District provide Brooklyn with a Section 504 Plan, a less intensive intervention than an IEP,[8] because of the Parent's concerns about her social and emotional well-being. F.F. ¶ 7; N.T. at 53-54.[9] On October 8, 2020, the District sent Brooklyn's parents a form requesting their consent to conduct an initial individual evaluation of Brooklyn. P-9. The Parent gave her written consent to the evaluation. *Id.* at 3-4.

On December 4, 2020, the District School Psychologist (the "DSP"), a Board-Certified Behavior Analyst, sent Brooklyn's parents an evaluation report. F.F. ¶ 8; P-10. The conclusions of the evaluation were that Brooklyn's cognitive functioning was in the "Low Average" range compared to other children of the same age; that Brooklyn demonstrated strength in speed processing tasks; that her reading ability performance was "Average"; and that there was some discrepancy between her weaknesses in math problem-solving, and her third-grade chapter test

---

once a week. F.F. ¶ 14; N.T. at 482. The social worker, however, recalled meeting with Brooklyn only once during her third-grade year. F.F. ¶ 15; N.T. at 406-10. At this meeting, the social worker gave Brooklyn "check-in" cards that she could use to see the social worker as needed, but did not recall Brooklyn ever using the cards. *Id.*

[8] *See generally* Perry Zirkel, *A Comparison of the IDEA and Section 504/ADA*, 178 Ed. L. Rep. 1 (2004) (providing a comprehensive comparison between IEPs and Section 504 Plans).

[9] On the Evaluation Report, the precise wording under the "Reason(s) for Referral" heading is: "[Parent] requested a 504 plan for Brooklyn on 9/21/2020, stating that Brooklyn is a 'sensitive dramatic child.'" P-10.

results, which fell in the "Proficient" and "Advanced" range. F.F. ¶ 8. Based on the evaluation, the DSP concluded that there was no discrepancy between Brooklyn's ability and her performance sufficient to meet the IDEA eligibility criteria for Specific Learning Disability ("SLD"). *Id.* The DSP also concluded that Brooklyn did not meet the IDEA eligibility criteria for Emotional Disturbance ("ED"). F.F. ¶ 9. Accordingly, the DSP did not recommend that Brooklyn be put on an IEP. F.F. ¶¶ 8, 10.

The DSP recommended that the District address Brooklyn's math weaknesses through less intensive measures than an IEP. F.F. ¶ 10. She also recommended that a Section 504 Plan be put in place to address Brooklyn's social and emotional needs. *Id.* The District developed a Section 504 Plan that was put into place in January 2021. *Id.*

### c) The Certified School Psychologist Report

After the Section 504 Plan was put in place, Brooklyn continued to exhibit troubling social-emotional behavior at home. P-16 at 3, 5-6. Brooklyn's parents hired an outside Certified School Psychologist (the "CSP") to conduct an independent review of the District's evaluation report and the DSP's conclusions and recommendations. F.F. ¶ 11. The CSP conducted a records review and virtual interviews with both the Parent and Brooklyn. *Id.* The CSP did not administer additional testing, and did not interview Brooklyn's father or any of her teachers. *Id.*

The CSP's Report, dated June 8, 2021, disagreed with the DSP's evaluation and concluded that Brooklyn met the IDEA eligibility requirements for SLD. *Id.* The CSP based her conclusion on Brooklyn's very low higher-order reasoning skills as reflected in her cognitive performance, reasoning that these skills impact her comprehension skills across the curriculum and cause her to become frustrated and confused in class. *Id.*; P-16 at 6. The CSP opined that Brooklyn's frustration may cause her to "keep behavior in check during the school day, then

decompensate at home," explaining her troubling behavior outside of school. F.F. ¶ 11; P-16 at 5. The CSP also found significant variation in her standardized test performance, and found that Brooklyn's challenges were becoming more evident as her academic demands increased. *Id.*; P-16 at 4. The CSP opined that the COVID-19 pandemic, although possibly a "contributing factor," was not the reason for her social-emotional difficulties and should not result in a denial of necessary special education. F.F. ¶ 11.

Although the CSP did find conclude that Brooklyn met the IDEA eligibility requirements for SLD, she did agree with the DSP's assessment that Brooklyn was not eligible for an IEP under the ED category. F.F. ¶ 12 The CSP did, however, opine that, if Brooklyn's academic needs were addressed, her social and emotional difficulties would abate. F.F. ¶ 12.

### 2.   Brooklyn's Challenge to the District's Actions

On March 31, 2021, Brooklyn filed a due process complaint challenging the District's actions on several grounds. H.O.D. at 1. Brooklyn contended that she had been denied a FAPE under the IDEA and Section 504 of the RA. *Id.* Brooklyn argued that the District: (1) had failed to satisfy its "child-find" requirement, which obligates the District to properly and timely identify and evaluate students who are potentially eligible for special education under the IDEA and Section 504; (2) had incorrectly determined that Brooklyn was not eligible under the IDEA classifications of SLD or ED and failed to provide Brooklyn with an appropriate program and placement under IDEA; and (3) had not offered an appropriate Section 504 Plan. *Id.* at 1-2. Brooklyn therefore sought an order that the District provide compensatory education for the period from March 31, 2019 until an appropriate IEP or, in the alternative, an appropriate Section 504 Plan was developed. *Id.* at 2.

On August 27, 2021, following a two-day evidentiary hearing, the Hearing Officer

charged with adjudicating Brooklyn's challenge to the District's actions issued a decision on the merits of Brooklyn's claims. *See* H.O.D. The Hearing Officer found that the District's 2017 evaluation of Brooklyn in her kindergarten year was sufficiently timely and thorough to satisfy the District's "child-find" obligations. *Id.* at 12. The Hearing Officer also found that Brooklyn did not meet her burden of proving that she was eligible under the IDEA classifications of SLD or ED, nor did she show that the District had failed to provide her with an appropriate program and placement under the IDEA following the District's 2020 evaluation. *Id.* at 13-18. Accordingly, the Hearing Officer found that Brooklyn was not entitled to relief on those claims. *Id.*

The Hearing Officer did, however, grant Brooklyn's request for relief in part. *Id.* at 2. The Hearing Officer ruled that the District's Section 504 Plan was not appropriate because its accommodations were too general to adequately address Brooklyn's social-emotional challenges. *Id.* at 21.[10] The Hearing Officer ordered the District's Section 504 Team to meet within thirty days of the date of the decision to revise Brooklyn's Section 504 Plan to better address her needs. *Id.* The Hearing Officer also ruled that Brooklyn was entitled to one hour of compensatory education per week, during the weeks that school was in session, from January 11, 2021, the date of the Section 504 Plan eligibility meeting, until an appropriate Section 504 plan was implemented. *Id.* at 23-25.

On June 16, 2022, Plaintiffs filed this motion.

---

[10] The Hearing Officer noted the lack of specificity in the Plan's accommodation of "Access to the school social worker/guidance counselor on an as needed basis," strongly suggesting that a new Section 504 Plan (1) "clarify" how counseling services can be provided "on a more regular basis than 'as needed,'" and (2) incorporate the CSP's recommendation that Brooklyn be placed in a social skills group. H.O.D. at 22-23

## II.    LEGAL STANDARD

"When considering an appeal from a state administrative decision under the IDEA, district courts apply a nontraditional standard of review, sometimes referred to as 'modified de novo' review." *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 564 (3d Cir. 2010). "Factual findings from the administrative proceedings are to be considered prima facie correct.  If a reviewing court fails to adhere to them, it is obliged to explain why." *S.H. v. State-Operated Sch. Dist. of City of Newark*, 336 F.3d 260, 270 (3d Cir. 2003) (citation omitted) (internal quotation marks omitted).

"Courts cannot 'impos[e] their own view of preferable educational methods on the states,' and therefore must afford 'due weight' to the Hearing Officer's findings in the administrative due process hearing." *J.C. v. Upper Darby School Dist.*, No. 20-CV-5030, 2022 WL 17324587, at *6 (E.D. Pa. Nov. 29, 2022) (McHugh, J.) (alteration in original) (quoting *D.S.*, 602 F.3d at 564); *see also Gagliardo v. Arlington Central School Dist.*, 489 F.3d 105, 113 (2d Cir. 2007) ("[F]ederal courts reviewing administrative decisions must give 'due weight' to [administrative] proceedings, mindful that the judiciary generally 'lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'") (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 206, 208 (1982)).

"Claims for compensatory education and tuition reimbursement are subject to plenary review as conclusions of law. . . . Whether the District fulfilled its FAPE obligations is subject to clear error review as a question of fact."  *P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 735 (3d Cir. 2009) (cleaned up). Additionally, "[t]he issue of whether an IEP is appropriate is a question of fact." *S.H.*, 336 F.3d at 271. "Within the confines of these standards,

a district court is authorized to make findings based on the preponderance of the evidence and grant the relief it deems appropriate . . . ." *D.S.*, 602 F.3d at 564. A district court is to respect the credibility determination of the witnesses made by the administrative hearing officer unless "nontestimonial evidence" requires a contrary conclusion. *Shore Reg'l High Sch. Bd. of Educ. v. P.S. ex rel. P.S.*, 381 F.3d 194, 200-01 (3d Cir. 2004). "[T]he party challenging the administrative decision bears the burden of persuasion before the district court as to each claim challenged." *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 270 (3d Cir. 2012).

## III.    DISCUSSION

Plaintiffs argue: (1) that the District violated its "child-find" obligations by failing to find Brooklyn eligible for special education services under the IDEA, and by not finding Brooklyn eligible under Section 504 in a timely fashion; and (2) that the amount of compensatory education awarded by the Hearing Officer is inadequate to remedy the District's alleged violations.

For the reasons set out below, I will deny the motion.

### A.  Brooklyn's Denial-of-FAPE Claim

"The IDEA creates a cause of action against a school district that fails to provide a FAPE to a child who has a disability and needs special education and related services." *J.M. v. Summit City Bd. of Educ.*, 39 F.4th 126, 138 (3d Cir. 2022) (citing 20 U.S.C. §§ 1412(a)(1)(A), 1415(f)(3)(E)(i)-(ii), (i)(2)). The Third Circuit has held that a denial-of-FAPE claim based on a "child-find" violation has three elements: (1) the child must have a disability for which he or she needs special education and related services; (2) the school district must breach its "child-find" duty; and (3) the school district's "child-find" breach must impede the child's right to a FAPE, or, alternatively, the "child-find" breach must either significantly impede parental participation

rights, or cause a deprivation of educational benefits. *Id.* (cleaned up). The "child-find"

obligation requires school districts to "identif[y], locate[], and evaluate[]" all "children with

disabilities . . . who are in need of special education and related services." 20 U.S.C.

§ 1412(a)(3)(A); *see also* 20 U.S.C. § 1401(29) (defining "special education"), 20 U.S.C.

§ 1401(26) (defining "related services").

Because Plaintiffs fail to satisfy any of the three elements of a successful denial-of-FAPE

claim, I will deny the motion.

### 1. Element One: Brooklyn Must Have a Disability for Which She Needs Special Education and Related Services

Brooklyn has not met her burden of persuasion to show that she has a disability for which

she needs special education and related services. The DSP concluded that Brooklyn is not

eligible under the IDEA because there was not a significant discrepancy between her cognitive

ability and academic achievement. H.O.D. at 17; N.T. at 177-78. Plaintiffs argue that Brooklyn is

eligible for special education and related services under the IDEA because the outside CSP

concluded that Brooklyn has a specific learning disability in both reading and math. ECF No. 16-

2 at 15.[11] The CSP based her conclusion on the "significant discrepancy among Brooklyn's

subtests within the different composite indices," and on Brooklyn's sub-average standardized test

performance and math problem solving. *Id.* at 16. In addition, the CSP noted that Brooklyn's

---

[11] Plaintiffs claim that the Hearing Officer "did not in any way analyze SLD in reading, only math," and that this constitutes an "egregious" omission. ECF No. 16-2 at 15. This is an inaccurate reading of the Hearing Officer's Decision. The Hearing Officer analyzed the DSP's testimony as to whether Brooklyn met the category for *any* SLD, not only math, and the analysis applies equally to Brooklyn's math and reading performance. H.O.D. at 17 ("Contrary to the CSP's opinion, the DSP concluded that the Student is not eligible for SDI under the SLD category because there was no significant discrepancy between the Student's cognitive ability and academic achievement. Furthermore, the Student's test scores on the local assessments were beyond the Student's cognitive ability, which does not correlate with an SLD classification.").

academic struggles were the cause of her social-emotional struggles. *Id.*

The Hearing Officer found that the CSP and the DSP "[b]oth presented credible testimony, yet came to different conclusions after evaluating the Student's educational record." H.O.D. at 17. The Hearing Officer also found that the District used technically sound assessment tools, and did not rely on any single procedure as a sole criterion to determine the appropriate educational program for meeting Brooklyn's needs. *Id.* After two days of evidentiary hearings, the Hearing Officer found that the opinions of Brooklyn's third- and fourth-grade teachers, both of whom "have extensive experience teaching special education," should be weighted more heavily than the opinion of the CSP. *Id.* This is because the CSP "only reviewed records and met with the Parent and Student for less than an hour," whereas "the teachers each had the Student in their classroom for a school year." *Id.* The Hearing Officer concluded, after weighing the evidence, "that the Parent did not meet the burden of proving that the Student is eligible for an IEP under IDEA" because "the evidence is insufficient to conclude that Student requires adaptations of the content, methodology, or delivery of instruction because of a disability." *Id.* "IDEA eligibility is a two-part test, and the existence of a disability standing alone does not satisfy both prongs. The Hearing Officer finds that the Student does not meet the second prong because the preponderance of the evidence fails to prove that the Student needs specially designed instruction to benefit from education." *Id.* at 17-18.

Giving due weight to the findings of the Hearing Officer, and after a review of the administrative record, I affirm the Hearing Officer's conclusions and find that Plaintiffs have not met their burden of persuasion as to the first element, whether Brooklyn has a disability for which she needs special education and related services. Whether a student meets the eligibility requirements for specialized education under the IDEA is a question of fact. *P.P. ex rel. Michael*

*P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 735 (3d Cir. 2009). The Hearing Officer found

that the witnesses for both sides in the administrative hearing were credible, and the Court is

obliged to respect that credibility determination unless there is "nontestimonial evidence" that

requires a contrary conclusion. *Shore Reg'l High Sch. Bd. of Educ. v. P.S. ex rel. P.S.*, 381 F.3d

194, 200-01 (3d Cir. 2004).

The Hearing Officer was presented with conflicting conclusions by highly qualified

special education professionals. The CSP concluded that Brooklyn meets the IDEA eligibility

criteria for SLD; the DSP concluded that Brooklyn does not. Even if the conclusions and

testimony of the two psychologists are given equal weight,[12] the Hearing Officer correctly found

that the testimony from Brooklyn's teachers tips the scales in favor of the District. Brooklyn's

third-grade teacher testified that, although Brooklyn would sometimes get upset and cry when

aspects of class became challenging, "by the end of the school year [Brooklyn] became a very

good advocate for herself. She had no problem raising her hand, saying Mrs. [D], I don't

understand that question or I want your help." N.T. 474-75. She further testified that Brooklyn's

behavior was "typical" of a third-grade student, and that given her eleven years of special

education experience, she would have brought Brooklyn up to the school's Student Support

Team ("SST") if she thought Brooklyn needed extra support. *Id.* at 475-76. Brooklyn's fourth-

---

[12] Although unnecessary to the disposition of this motion, I note that based on the DSP's testimony and the administrative record, the DSP's evaluation appears to have been more comprehensive and thorough than that of the CSP. In addition to reviewing Brooklyn's records and input from Brooklyn's parents, the DSP obtained input from Brooklyn's third- and fourth-grade teachers; observed Brooklyn in her virtual classroom on two occasions; and conducted cognitive and achievement testing. N.T. 130-31; P-10. In contrast, the CSP based her conclusions on one interview with Brooklyn, one interview with the Parent, a parent input form, and a review of Brooklyn's academic records. N.T. 276-78; P-16. Moreover, the CSP's report gives very little attention to the potential impact of the COVID-19 pandemic and the death of Brooklyn's grandfather on her social and emotional well-being, whereas the DSP more extensively took those factors into account. N.T. 179; P-10; P-16.

grade teacher testified that Brooklyn showed growth between her Fall and Spring MAPs assessment tests, with marked improvement once instruction switched from a completely virtual model to a hybrid model. F.F. ¶ 18; N.T. 369, 373. She testified that, given her twenty-four years of special education experience, she also would have referred Brooklyn to the SST if she thought Brooklyn needed to be evaluated for an IEP. F.F. ¶ 18; N.T. 365-66. Importantly, both teachers' conclusions were supported by extensive in-class observation of Brooklyn.

In affirming the District's determination that Brooklyn does not have a disability for which she needs special education and related services, the Hearing Officer gave the proper weight to the views of the experienced teachers who had the benefit of in-class observation of Brooklyn. There is no nontestimonial evidence in the administrative record that would require a contrary conclusion. Therefore, Plaintiffs are not able to show by a preponderance of the evidence that the CSP's conclusions were correct, and the District's were in error. Accordingly, Plaintiffs are unable to satisfy the first element of their denial-of-FAPE claim.

## 2. Element Two: The District Must Have Breached its "Child-Find" Duty

Because Plaintiffs have not met their burden of persuasion to show that Brooklyn meets the IDEA's eligibility requirements, Plaintiffs' denial-of-FAPE claim must fail. For the sake of thoroughness, however, I will analyze Plaintiffs' argument that the District breached its "child-find" duty by not conducting a comprehensive evaluation of Brooklyn in her kindergarten or second-grade year. ECF No. 16-2 at 11. Plaintiffs argue that the District's 2017 evaluation was insufficient to meet its "child-find" obligation because the District only conducted a speech and language evaluation, rather than the comprehensive psychoeducational evaluation the Parent requested. *Id.* at 16. Plaintiffs further argue that the District failed to appropriately evaluate Brooklyn for social-emotional challenges in February of 2019, when they reevaluated her

progress in reaching her IEP speech and language goals. *Id.*

The Hearing Officer found that Plaintiffs did not establish that the District had violated its "child-find" obligation. H.O.D. at 12. "[W]hen the Parent requested an evaluation during the Student's Kindergarten year, the District responded by issuing a PTE, evaluating the Student's speech and language needs and offering an IEP to address those needs." *Id.* The District's determination that a full psychoeducational evaluation was unnecessary, the Hearing Officer explained, was based on a review of Brooklyn's educational records. *Id.* "Four years later it is difficult to refute the soundness of that conclusion in light of the fact that when the District did conduct a full comprehensive evaluation in 2020, the Student was not found to be eligible for an IEP under the IDEA category of SLD." *Id.*

The "child-find" obligation requires school districts to "identif[y], locate[], and evaluate[]" all "children with disabilities . . . who are in need of special education and related services." 20 U.S.C. § 1412(a)(3)(A); *see also* 20 U.S.C. § 1401(29) (defining "special education"), 20 U.S.C. § 1401(26) (defining "related services"). "A school district has a duty to evaluate a child for a disability upon 'notice of behavior that is likely to indicate a disability.'" *J.M. v. Summit City Bd. of Educ.*, 39 F.4th 126, 137 (3d Cir. 2022) (quoting *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 250 (3d Cir. 2012)); *see also P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 738 (3d Cir. 2009) (explaining that the "child-find" duty imposes a "continuing obligation" on school districts to evaluate "all students who are reasonably suspected of having a disability under the statute[]").

"Once a school district has such a reasonable suspicion that a child has a disability, it has a reasonable time to evaluate 'the specific problems a potentially disabled student is having.'" *J.M.*, 39 F.4th at 137 (quoting *D.K.*, 696 F.3d at 250). The Third Circuit has held that the "child-

find" duty "does not demand that schools conduct a formal evaluation of every struggling student." *D.K.*, 696 F.3d at 249. Nor are districts required "to diagnose a disability at the earliest possible moment . . . in part because some disabilities 'are notoriously difficult to diagnose and even experts disagree about whether [some] should be considered a disability at all.'" *Id.* (citation omitted) (alterations in original). When a district does make the decision to evaluate a student, the district must assess the student "in all areas of suspected disability" and "seek to gain 'relevant information' about the 'educational needs of the child' to determine if the child needs special education and related services." *J.M.*, 39 F.4th at 137 (quoting 20 U.S.C. § 1414(b)(3)(B)-(C)). Evaluations, however, "need not be designed to identify and diagnose every possible disability." *D.K.*, 696 F.3d at 250.

Plaintiffs' argument is essentially that the District should have been on notice that Brooklyn was likely to have a disability earlier than Fall of 2020, when the District conducted its comprehensive evaluation, and that waiting until February 2020 was not a reasonable timeframe in which to evaluate Brooklyn for specialized educational services.[13]

---

[13] In establishing what constitutes a reasonable timeframe in which to conduct a comprehensive evaluation, Plaintiffs cite to *W.B. v. Matula*, 67 F.3d 484 (3d Cir. 1995), *abrogated on other grounds by A.W. v. Jersey City Pub. Sch.*, 486 F.3d 791 (3d Cir. 2007), in which the Third Circuit found that a reasonable juror could conclude that a delay of six months constituted a breach of the district's "child-find" duty. But this case is unhelpful to Plaintiffs' argument for two reasons. First, the question before the Third Circuit in *W.B.* was not whether the petitioner had met their burden of persuasion to overturn an underlying administrative decision, but whether summary judgment was proper in a § 1983 claim premised on a breach of the IDEA and RA. (Twelve years later, the Third Circuit held that a § 1983 action was not available to remedy alleged violations of the IDEA or RA. *A.W.*, 486 F.3d 791.) Here, Plaintiffs' burden is higher. Second, the facts of *W.B.* were far more favorable to the petitioner than they are to the Plaintiffs in this action. The record in *W.B.* indicated that the student's family "had held numerous conversations with [the district] . . . regarding [the student's] behavioral problems" and several district employees "had significant first-hand knowledge of [the student's] bathrooming difficulties." *W.B.*, 67 F.3d at 501. In addition, the family sent the school principal "information regarding ADHD." *Id.* Under those facts, the Third Circuit found that a reasonable juror could find that six months constituted an unreasonable timeframe in which to conduct a comprehensive

When the Parent requested that the District conduct a full psychoeducational evaluation of Brooklyn in her kindergarten year, the District responded by sending the Parent a PTE in a timely fashion. F.F. ¶ 1. Although the Parent did request a comprehensive evaluation, the District made a reasoned determination based on Brooklyn's academic performance that only a speech and language evaluation was necessary. *Id.*[14] The Parent consented to this evaluation. *Id.*; P-1; S-1. When a school district conducts an evaluation of a struggling student, that evaluation "need not be designed to identify and diagnose every possible disability." *D.K.*, 696 F.3d at 250. As the Hearing Officer observed, this determination to conduct a more limited evaluation appears in hindsight to have been to be the correct one, as four years later the DSP concluded that Brooklyn did not meet the eligibility criteria for SLD under the IDEA, and both the DSP and the CSP agreed that Brooklyn did not meet the eligibility requirements for ED. F.F. ¶¶ 9, 12.

Regardless, even if Brooklyn had later been found to have an emotional disability, that alone would not necessarily mean that the District had breached its "child-find" duty. Without a preponderance of evidence that the District should have been on notice that Brooklyn had a specific disability in her kindergarten year, a failure "to diagnose a disability at the earliest possible moment" does not constitute a failure of a district's "child-find" obligation. *D.K.*, 696 F.3d at 250.

Moreover, the 2017 evaluation was thorough, and concluded that Brooklyn would benefit from specialized instruction under the IDEA disability category of Speech or Language

---

evaluation. Here, as discussed below, the facts show that each time the District was made aware of significant behavioral problems Brooklyn was experiencing, the District responded in a prompt fashion.

[14] In support of the assertion that "Brooklyn began displaying academic and social-emotional struggles in school and at home at an early age," ECF No. 16-2 at 3, Plaintiffs point only to Brooklyn's report card, which notes: "verbal & physical self-control needed in classroom" and "improved attention needed." *Id.*; P-15 at 1.

Impairment. F.F. ¶ 2. The District recommended an IEP that provided speech and language therapy to Brooklyn for thirty minutes once a week. *Id.*

Plaintiffs argue that the 2019 evaluation, when the District reevaluated Brooklyn and her progress towards meeting her IEP goals, was the second moment at which the District should have conducted a full psychoeducational evaluation of Brooklyn. ECF No. 16-2 at 16. Plaintiffs assert that, when the District evaluated Brooklyn in 2019, "the District attempted to minimize and dismiss Brooklyn's very real social-emotional struggles" by limiting the evaluation to speech and language testing. *Id.* But the Hearing Officer did not find that the Parent brought any social-emotional concerns to the District's attention in the course of this reevaluation, and there is no nontestimonial evidentiary support in the administrative record to contradict that finding.

Contrary to Plaintiffs' assertion that the Parent spent "years . . . unsuccessfully pleading with the District to provide her daughter with an IEP," ECF No. 16-2 at 14, the record clearly shows that when the Parent requested an evaluation in kindergarten, the District conducted one, and provided Brooklyn with an IEP. Moreover, when the District recommended that Brooklyn exit special education because she had achieved her IEP goals, the Parent approved the recommendation. F.F. ¶ 2; P-5 at 23.

Plaintiffs' argument that the 2019 reevaluation was a missed opportunity to properly diagnose Brooklyn is based largely on the assertion that the District knew of Brooklyn's February 2019 diagnoses of Other Specified Depressive Disorder. ECF No. 16-2 at 5; N.T. 50-53. Plaintiffs assert that the Parent shared this diagnosis with the District in 2019. ECF No. 16-2 at 5; ECF No. 20 at 6. However, the Hearing Officer concluded that "it appears as though the Parents' [sic] concerns [about Brooklyn's diagnosis] were not brought to the District's attention until third grade." F.F. ¶ 5. Although the Hearing Officer does not explain the basis for this

conclusion, it seems to be based on the Parent's October 5, 2019 request that Brooklyn be referred to a school social worker because she "ha[d] been getting very upset often and at random times and then w[ould] begin to cry." F.F. ¶ 14; P-8.

The Hearing Officer did not make a finding that the Parent shared the February 2019 diagnosis with the District, and there is no nontestimonial evidence on the record to contradict this conclusion. The only evidence Plaintiffs cite to in support of the assertion that the Parent shared the Other Specified Depressive Disorder diagnosis with the District in early 2019 is the Parent's testimony at the administrative hearing:

> Q. Back in 2019 when she received that diagnosis, did you share that information with the District?
> A. Yes.
> Q. Did you share this report at P-6 with the District around the time that this report came out?
> A. I don't even – I don't remember how I shared that. I don't remember if I signed a release, if I just E-mailed the teacher. I don't recall how I –
> Q. All right. [. . .]

N.T. at 51. Presuming that the Hearing Officer's factual findings are *prima facie* correct, *S.H. v. State-Operated Sch. Dist. of City of Newark*, 336 F.3d 260, 270 (3d Cir. 2003), the Parent's vague recollections of sharing the diagnosis with the District some time in 2019 are insufficient to overcome that presumption. Therefore, I cannot conclude that the District knew of Brooklyn's diagnosis at the time of the February 2019 reevaluation.

The administrative record is clear that in both instances where the Parent requested a full psychoeducational evaluation, the District responded in a reasonable timeframe with an appropriate range of assessment tools. Therefore, Plaintiffs cannot meet their burden of persuasion that the District breached its "child-find" obligation by failing to identify Brooklyn as

in need of special education services, and cannot satisfy the second element.[15]

### 3. Element Three: Any Alleged "Child-Find" Breach Must Have Impeded Brooklyn's to a FAPE

As to the third element, because the District did not breach its "child-find" duty, the

District did not impede Brooklyn's right to a FAPE by failing to find her eligible for specialized

education services under the IDEA. *See J.M. v. Summit City Bd. of Educ.*, 39 F.4th 126, 138 (3d

Cir. 2022).

### B. The Hearing Officer's Award of Compensatory Education

Plaintiffs contend that the Hearing Officer awarded an inadequate amount of

compensatory education to remedy the District's alleged failures under the IDEA and the

Rehabilitation Act. ECF No. 16-2 at 21-25. Because Plaintiffs have not met their burden of

showing that any portion of the Hearing Officer's "child-find" analysis was in error, I will not

---

[15] Plaintiffs argue that the District breached its "child-find" duty in two separate ways: as to the duty imposed by the IDEA, and as to the duty imposed by Section 504, and assert that the Hearing Officer failed to conduct a separate "child-find" analysis under Section 504, "erroneously conflating Section 504's and IDEA's child-find requirements." ECF No. 20 at 6. Plaintiffs claim that the District should have identified Brooklyn as having a disability under Section 504 in kindergarten, and that the Hearing Officer failed by not analyzing whether this constitutes a breach of the District's separate Section 504 "child-find" duty. *Id.* at 7-8. Although Plaintiffs are correct that the reach of Section 504 is broader than that of the IDEA, and Section 504 and the IDEA each have "child-find" obligations, none of the cases they cite to support the assertion that the District breached its Section 504 "child-find" duty separately from its IDEA "child-find" duty in this instance. When a party makes claims under Section 504 that are "parallel" to IDEA claims, "*i.e.*, because both claims concern the District's alleged FAPE denial, resolution of the IDEA issue will also resolve the Rehabilitation Act issue." *A.B. through K.B. v. Abington Sch. Dist*, 440 F.Supp.3d 428, 434 n.5 (E.D. Pa. 2020) (Beetlestone, J.) (citation omitted); *see also P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 735 (3d Cir. 2009) (explaining that "[t]he IDEA and § 504 of the Rehabilitation Act do similar statutory work" in the "child-find" analysis). Here, the Plaintiffs' Section 504 and IDEA claims are parallel to one another because both concern the same conduct by the District in allegedly denying a FAPE to Brooklyn. Therefore, a separate Section 504 "child-find" analysis by the Hearing Officer was unnecessary. Even if a separate Section 504 "child-find" analysis were necessary, the District discharged its obligations because, as discussed above, the District timely evaluated Brooklyn for suspected disabilities in a thorough manner.

disturb the Hearing Officer's award of compensatory education as it relates to any alleged failure to identify Brooklyn under the IDEA or Section 504 by any particular date.

Plaintiffs' remaining claim, then, is that one hour per week of compensatory education from January 11, 2021 (the date of the Section 504 Plan eligibility meeting) until the date an appropriate Section 504 plan is implemented, is "shockingly low" and "irrational." *Id.* at 24. This is because, Plaintiffs assert, "a child who needs special education services for social, emotional, behavioral, and academic needs is certainly going to require more than one hour per week of special education support regardless of whether it is through an IEP or 504 plan." *Id.*

"[C]ompensatory education is an equitable remedy that compensates a special needs student 'for rights the district already denied him.'" *D.F. v. Collingswood Borough Bd. of Educ.*, 694 F.3d 488, 497 (3d Cir. 2012) (quoting *Lester H. by Octavia P. v. Gilhool*, 916 F.2d 865, 872 (3d Cir. 1990)). "[C]laims for compensatory education and tuition reimbursement are subject to plenary review as conclusions of law. . . ." *P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 735 (3d Cir. 2009). Plaintiffs cite to nothing in the record in support of the claim that the Hearing Officer's award is "shockingly low" or "irrational," and employ circular reasoning that the award of compensatory education is inadequate because Brooklyn must "certainly require" a greater amount. ECF No. 16-2 at 24.

Accordingly, I will affirm the Hearing Officer's award of compensatory education.

## IV.    CONCLUSION

For the reasons set forth above, I will deny Plaintiffs' motion for judgment on the administrative record.


s/Anita B. Brody


    s/ANITA B. BRODY, J.
ANITA B. BRODY, J.


Copies **VIA ECF**

**Appendix A**

**Glossary of Abbreviations**

- CSP – Certified School Psychologist

- DSP – District School Psychologist

- ED – Emotional Disturbance

- FAPE – Free Appropriate Public Education

- FBA – Functional Behavior Assessment

- IDEA – Individuals with Disabilities Education Act

- IEP – Individualized Education Program

- PBSP – Positive Behavior Support Plan

- PTE – Permission to Evaluate

- RA – Rehabilitation Act

- SLD – Specific Learning Disability

- SST – Student Support Team