IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BROOKLYN S.-M., *through her parent,* GABRIELLE M., : : : | |
| Plaintiffs, : : | CIVIL ACTION No. 21-5164 |
| v. : : | |
| UPPER DARBY SCHOOL DISTRICT, : : | |
| Defendant. : | |

May 6, 2025                                                                                         Anita B. Brody, J.

### MEMORANDUM OPINION

During the 2020-21 academic year, while students were still engaged in remote learning due to the Covid-19 pandemic, the Upper Darby School District (the "District") recognized that one of its fourth-grade students, Brooklyn S.-M. ("Brooklyn") had a psychological impairment that impacted her learning. Its finding made her eligible for accommodations under Section 504 of the Rehabilitation Act of 1973 ("Section 504"), one of two federal laws that concern students with disabilities in the education setting. The issue before me is whether the District should have made this identification, and provided appropriate accommodations to mitigate the impact of her impairment on her education, at an earlier date.

I.   **BACKGROUND**[1]

Brooklyn began attending school in the District as a kindergartener in the 2016-17

---

[1] The broader factual background of this dispute is set out in my prior decision and the Third Circuit decision following Plaintiffs' appeal of one aspect of my ruling. *See B.S.M. v. Upper Darby Sch. Dist.*, 103 F.4th 956 (3d Cir. 2024). On remand, I must resolve the factual question of whether the District actually knew that Brooklyn had been diagnosed with a psychological impairment, and thus might have qualified as disabled under Section 504, prior to her fourth-

1

academic year. She was in first grade from 2017-18; second grade from 2018-19; third grade from 2019-20, including when the Covid-19 pandemic began in March of 2020; and fourth grade from 2020-21, when the District began the school year in a remote learning environment and returned to in-person instruction in March 2021.

### A. History of Brooklyn's access of disability-related services in the District

#### 1. IEP for Speech or Language Impairment (2016-17)

In the middle of Brooklyn's kindergarten year, her mother, Gabrielle M. ("Mother"), asked the District to conduct a full psychoeducational evaluation of Brooklyn, including a speech and language evaluation and testing for any learning differences. The District reviewed Brooklyn's academic records, classroom performance, and assessments of her early literacy skills. It determined that an evaluation for a speech or language impairment was warranted but that a full psychoeducational evaluation was not. After Brooklyn was evaluated, the District accepted the recommendation that Brooklyn receive speech and language therapy. In conjunction with Brooklyn's parents, the District developed an individualized education plan ("IEP") in which it committed services to address Brooklyn's "Speech or Language Impairment," a recognized classification under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400, *et seq.* ("IDEA"). Those services continued until the spring of Brooklyn's second grade year, when a reevaluation confirmed that Brooklyn had achieved the goals set out in the IEP.

---

grade year. This factual determination will inform my evaluation of whether the District violated its "Child Find" obligations under Section 504.
   I cite to the Administrative Record by reference to the parties' exhibits as numbered and presented to the Hearing Officer ("Ex. P-__" and "Ex. S-__") and the Notes of Testimony of the proceedings before the Hearing Officer ("N.T.").

**2. Section 504 Plan for mood disorder impacting learning (2020-21)**

In Brooklyn's fourth-grade year, Mother requested that the District develop a "Section 504 Plan," that is, a Services Agreement under Section 504 of the Rehabilitation Act. She pointed to her concerns about Brooklyn's social and emotional wellbeing, sharing her perspective that Brooklyn was a "sensitive, dramatic child." Ex. P-10 at 2. The District promptly embarked upon a comprehensive special education evaluation under the guidance of a board-certified school psychologist. This process, which began in October 2020, assessed Brooklyn's cognitive, academic, and social-emotional functioning to determine her strengths and needs and her eligibility for special education and related services. The psychologist reviewed the District's educational records as to Brooklyn, as well as statements from several of her teachers; interviewed Brooklyn's parents about her development and behavior; observed her in the "virtual" classroom that the District was then using due to the Covid-19 pandemic; and administered cognitive and achievement testing. Mother also provided the psychologist with information concerning an evaluation of Brooklyn that had been undertaken by the Child Guidance Resource Center, a community mental health provider, at Mother's request and which yielded a diagnosis of "Other Specified Depressive Disorder." That evaluation dated to February 2019, during Brooklyn's second grade year. Ex. P-10 at 2-4. *See also id.* at 2 (District Evaluation Report including this information in a section of report form for "Evaluations and information provided by the parents of the student.").

The District's psychologist issued her Evaluation Report on December 5, 2020. Ex. P-10. She concluded that Brooklyn did not meet the criteria for a "Specific Learning Disability" nor for an "Emotional Disturbance," two of the impairments covered by the IDEA. With respect to social-emotional concerns, she memorialized that "more difficulties were reported in the home

3

than the school setting." Ex. P-10 at 25.  But she recommended that the District develop a 504 Plan "to address accommodations for [Brooklyn's] diagnoses of Other Specified Depressive Disorder," as well as an assistance plan and math supports that could be provided.  Ex. P-10 at 1.

On January 7, 2021, as the District initiated the process to develop appropriate accommodations, it received from Mother another report from a community mental health provider concerning Brooklyn.[2]  This Biopsychosocial Evaluation report, dated October 5, 2020 and prepared by Gemma Services, reflected Mother's concerns at that time of Brooklyn's emotional dysregulation, frequent meltdowns and tantrums, and social challenges.[3]  The examining psychologist at that clinic diagnosed Brooklyn with "Disruptive Mood Dysregulation Disorder."  ECF No. 2-9 at 188.

Upon receipt and review of this evaluation, the District recognized that Brooklyn's impairment limited the substantial major life activity of "learning."  ECF No. 2-8.  The District concluded that "Brooklyn would better be able to attend to schooling with accommodations to address shutting down and crying behaviors that impact staff's ability to effectively engage Brooklyn and her participation in classroom activities." *Id.* at 4.  On January 11, 2021, the District proposed a Section 504 Plan that identified a number of actions it would take in the classroom, including allowing Brooklyn access to the school social worker as needed and establishing regular communication with Brooklyn's family.  In response to a request by Mother,

---

[2]  The record does not indicate how the District came to be in possession of this Report apart from the date on which it was noted to have been "received."

[3]  The psychologist's report memorialized Mother's account that Brooklyn was "unable to regulate her mood to have positive interactions with others," and was having physical fights with her siblings.  ECF No. 2-9 at 130-31, Ex. P-6 at 1-2.  Brooklyn was also experiencing disruptive tantrums during this time "that include crying, yelling, slamming doors, and stomping her feet[.]"  *Id.* at 136, Ex. P-7 at 2.

4

the District's team met again in late February 2021 to review Brooklyn's progress under the 504 Plan, as Brooklyn had recently "had a significant emotional response to a mistake around an assignment."  ECF No. 2-9 at 10; Ex. S-39 at 1.  It was hoped that Brooklyn's frustration would decrease when the school returned to in-person instruction the following week.  *Id.*  Mother ultimately agreed to the District's 504 Plan to accommodate Brooklyn's mood disorder but voiced her complaint that she still believed Brooklyn required an IEP.  ECF No. 2-8 at 1; Ex. S-46 at 3.

### B. Administrative review

Mother filed an administrative special education due process complaint against the District on March 31, 2021, while Brooklyn was still in the fourth grade.  She sought an appropriate program and placement for Brooklyn as well as compensatory education for the deprivation of a free appropriate public education ("FAPE") for the maximum period allowed under the applicable statute of limitations.  She asserted claims under both the IDEA and Section 504, asserting that the District: (1) failed to properly and timely identify and evaluate Brooklyn's potential eligibility for services as required in each law's "Child Find" provision; (2) wrongly determined that Brooklyn was not eligible for another IEP under the IDEA; and (3) did not offer Brooklyn an adequate 504 Plan.

A Pennsylvania Special Education Hearing Officer convened evidentiary hearings in June and July 2021 to consider Mother's challenges.  In a decision issued on August 27, 2021, the Hearing Officer ultimately agreed that the 504 Plan provided by the District in February 2021 was deficient in certain respects.  She outlined the needed improvements and ordered a small amount of compensatory education from the date of implementation of the 504 Plan until it was

revised according to her directives.[4] The Hearing Officer otherwise concluded that the District had satisfied its Child Find obligations and that it had developed an appropriate program and placement for Brooklyn.[5]

## II.    PROCEDURAL OVERVIEW

Brooklyn, through Mother (collectively "Plaintiffs"), filed a complaint in this Court on November 23, 2021 for review of the Hearing Officer's decision.  Relying on the administrative record developed before the Hearing Officer, Plaintiffs filed a motion for judgment on the pleadings, seeking a ruling that the District violated its "Child Find" obligations under both Section 504 and the IDEA and that the Hearing Officer awarded inadequate compensation for Brooklyn's deprivation of a FAPE.  ECF No. 16.  In March 2023, I denied Plaintiffs' motion, leaving the Hearing Officer's adjudication undisturbed.  ECF Nos. 21, 22.  Plaintiffs filed an appeal of that decision, and the Third Circuit remanded for me to re-evaluate whether the District satisfied its Child Find obligations under Section 504 specifically.  *B.S.M. v. Upper Darby Sch. Dist.*, 103 F.4th 956 (3d Cir. 2024).  The parties agreed that I may again proceed on the administrative record, and they have provided updated briefs.  ECF Nos. 35, 36.

## III.    STANDARD OF REVIEW

The Third Circuit requires courts to give de novo review to appeals of administrative adjudications of Section 504 claims.  *See Le Pape v. Lower Merion Sch. Dist.*, 103 F.4th 966,

---

[4] Specifically, she required the District to clarify how counseling services could be provided on a more regular basis than "as needed" and suggested that Brooklyn be placed in a social skills group, as recommended by a psychologist retained by Brooklyn's family.  Hr'g Ofc'r Decision at 22-23.

[5] The Hearing Officer also agreed with the District's finding that Brooklyn did not have a disability under the IDEA and thus was not entitled to the IEP that Mother had requested.

6

983 (3d Cir. 2024) (observing that Supreme Court "has required district courts to apply modified de novo review only in their review of IDEA claims, and we decline to extend that review to claims under the ADA and Section 504"). In light of the Third Circuit's directions in *Le Pape* and *B.S.M.*, I will apply a de novo standard of review to any pertinent legal conclusions rendered by the Hearing Officer below. *See also A.V. by & through Stephen W. v. W. Chester Area Sch. Dist.*, No. CV 23-1306-KSM, 2024 WL 4340714, at *17 (E.D. Pa. Sept. 26, 2024) (concluding, following *Le Pape* and *B.S.M.* decisions, that "the Third Circuit does not intend to extend modified de novo review to Section 504 claims, including Section 504 claims that assert only a denial of FAPE"). I make any necessary factual determinations based on the closed Administrative Record.[6]

## IV. DISCUSSION

Plaintiffs contend that the District violated its Child Find obligation to identify Brooklyn as eligible for services under Section 504 when it failed to perform a comprehensive evaluation of her until her fourth-grade year, despite Mother's request for such an evaluation in her kindergarten year. They also highlight the second-grade year as another point at which the District should have considered whether Brooklyn had a 504-eligible disability, given that a community mental health provider diagnosed Brooklyn in February of that school year with depressive disorder.

Plaintiffs bear the burden to show by a preponderance of the evidence that the District knew or reasonably should have known that Brooklyn had a physical or mental disorder that substantially limited a major life activity as defined in Section 504 and its associated regulations.

---

[6] While I would ordinarily defer to the findings of fact of the Hearing Officer below, in this case she failed to make a finding as to the factual question that is most pertinent to the legal issue that remains: whether Mother made the District aware of Brooklyn's mental health diagnoses.

7

For the reasons set out below, I conclude that Plaintiffs have not carried their burden.

### A. Section 504: prohibition on discrimination; Child Find obligations

Section 504 of the Rehabilitation Act of 1973 prohibits discrimination on the basis of a handicap or disability, declaring that "[n]o otherwise qualified individual with a disability … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination" under any program that receives federal funds. 29 U.S.C. § 794(a). Coverage under this law extends to anyone who "has a physical or mental impairment which substantially limits one or more major life activities," or has a record of such impairment or is regarded as having such impairment. 34 C.F.R. § 104.3(j)(1). "Major life activities" include learning. 34 C.F.R. § 104.3(j)(2)(ii). Section 504 disability encompasses "any mental or psychological disorder, such as intellectual disability, organic brain syndrome, emotional or mental illness, and specific learning disabilities[.]" *B.S.M.*, slip op. at 12-13 & n.4, citing 34 C.F.R. § 104.3(j)(2)(i)(B).

In the context of public education, Section 504 and its associated regulations "require that school districts provide a free appropriate public education to each qualified handicapped person in its jurisdiction." *Ridgewood Board of Education v. N.E.*, 172 F.3d 238, 253 (3d Cir. 1999); 34 C.F.R. § 104.33(a). An "appropriate education" reflects "the provision of regular or special education and related aids and services" that are "designed to meet individual educational needs of handicapped persons as adequately as the needs of nonhandicapped persons are met[.]" 34 C.F.R. § 104.33(b). "Section 504 protects persons with disabilities by making it illegal for a federally funded program to discriminate against a disabled person solely by reason of his or her disability." *J.M. v. Summit City Bd. of Educ.*, 39 F.4th 126, 147 (3d Cir. 2022). To establish a violation of Section 504 in the context of public education, a plaintiff must show: (1) the child

was disabled; (2) the child was "otherwise qualified" to participate in school activities; (3) the school received federal financial assistance; and (4) the child was excluded from participation in, denied the benefits of, or subject to discrimination at the school. *Ridgewood*, 172 F.3d at 253.

While there is no explicit "child find" obligation expressed in the text of Section 504 as there is in the IDEA, courts have implied that the Rehabilitation Act obliges districts to "find" children who are at risk of disability discrimination to ensure they do not suffer such discrimination. In the context of this remand from the Third Circuit, I consider whether the District violated its child find duty under Section 504, focusing on the question of whether and when Brooklyn manifested an impairment that the District knew or should have known substantially limited her learning.

**B.      Should the District have reasonably suspected that Brooklyn had a Section 504-qualifying disability at some point prior to the 2020-21 school year?**

Plaintiffs contend that the finding in the fourth-grade year that Brooklyn had an impairment mandating a Section 504 accommodation demonstrates that there was a disability to "find" as far back as kindergarten, when Mother first requested that the district evaluate Brooklyn. The District asserts that it provided appropriate evaluations based on what District personnel observed as to Brooklyn's behavior and learning progress and with consideration of what the parents communicated as to Brooklyn's needs. The District also contends that the history of its responsiveness to Brooklyn's needs undermines Plaintiffs' contention in this litigation that Mother had previously made it aware of Brooklyn's February 2019 depressive disorder diagnosis but that it took no action.

**1.      The District did not violate its Section 504 Child Find obligation in the Kindergarten year (2016-17).**

Plaintiffs first suggest that the District's breach of its Section 504 "child-find" duty is

9

established by the fact that it did not conduct a comprehensive evaluation of Brooklyn in the kindergarten year when Mother requested it. ECF No. 16-2 at 11, 16. But Section 504 does not require a school district to conduct particular evaluations simply because parents request them. Faced with a parental request for "a full psychoeducational evaluation" of a student only a few months into her school career when the request appeared to be motivated by concerns of speech/language disabilities and possible learning differences, the District took a reasonable approach. It evaluated for speech/language concerns (and then provided necessary, and ultimately successful, therapy) and gave an explanation for why "cognitive and academic achievement testing was deemed unnecessary at this time[.]" ECF No. 2-9 at 1. This decisionmaking process also included "consultation with [Brooklyn's] parents." *Id.*

This leaves me to consider whether there is any other basis for the District to have suspected that Brooklyn required any accommodation for a Section 504 disability. Brooklyn's kindergarten report card reflects that Brooklyn needed improvement in attention and verbal/physical self-control. ECF No. 2-9 at 197. That report card also showed, in Marking Period 1 only, "difficulty accepting criticism." *Id.* In all three marking periods, however, her teacher rated Brooklyn's "behavior" as "satisfactory."

Early primary school years often see children exhibiting difficulty following instructions and tantrums. *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 251 (3d Cir. 2012). The recognition on the report card that Brooklyn needed to improve attention and verbal/physical self-control does not reflect that the District "knew" that Brooklyn had a disability as defined in Section 504, nor does it reflect that the District should reasonably have been expected to know that she had such a disability at this time. There is no contemporaneous evidence that Brooklyn was exhibiting clinically significant symptoms of Disruptive Mood Dysregulation Disorder at school during this

10

academic year.

The record also reflects that there were at least two contacts between Mother and the District concerning Brooklyn in the kindergarten year: (1) Mother's initial request for an evaluation; and (2) the consultation with the parents about the development of an IEP for Brooklyn's speech and language impairment. Brooklyn's parents did not convey that she was exhibiting depression, disruptive mood dysregulation disorder, or any other behavioral or emotional disorders that might substantially impact her learning. To be sure, Mother did not begin the process of putting Brooklyn on a wait list for evaluation for community mental health therapy until after the conclusion of this academic year, suggesting that even any concerning behaviors at home were not problematic during the kindergarten academic year.

Plaintiffs have not carried their burden to show by a preponderance of the evidence that the District should reasonably have been aware that Brooklyn had a 504-eligible disability in the kindergarten year.

### 2. The District did not violate its Section 504 Child Find obligation in the First Grade year (2017-18).

Plaintiffs do not identify any evidence that the District knew during Brooklyn's first grade year that she had a disability as defined in Section 504 nor that the District reasonably should have known that she had such a disability. Their only comment upon her first-grade experience related to her scores on math and reading assessments. *See* ECF No. 16-2 at 4.

There is no evidence that Mother shared with the District that her concerns about Brooklyn's mental health or behavior prompted her, during the summer before first grade, to put Brooklyn on a wait list for evaluation. Plaintiffs have not carried their burden to show by a preponderance of the evidence that the District violated its Child Find obligation during that academic year.

### 3. The District did not violate its Section 504 Child Find obligation in the Second Grade year (2018-19).

During the second-grade year, the classroom teacher observed that Brooklyn's "mood" was affected when she felt she was not being accepted by the girls in the grade, and that this issue at times would "creep into the classroom in the form of putting her head down, not paying attention, crying." ECF No. 2-9 at 113. The teacher noted that Brooklyn's "moods" and her lack of confidence played roles "in how active a participant she is each day." *Id.* at 113. The teacher documented that Brooklyn was "seeing the school social worker to help her talk about friendship issues in the class." Ex. P-5 at 11.

Second grade was also when Brooklyn underwent a re-evaluation of her need for an IEP for her speech impairment. That re-evaluation process, which began in February of this academic year, involved: "evaluations and information provided by the parent," where both Mother and Father responded; "aptitude and achievement tests"; "current classroom based assessments and local and/or state assessments"; and "observations by teacher(s) and related services providers." Ex. P-5 at 6-11. As noted earlier, the District concluded that Brooklyn's speech and language therapy was successful and she achieved the goals of her IEP.

It was also during this academic year, and also in February (2019), when Brooklyn received the diagnosis from a community provider of "Other Specified Depressive Disorder" and was approved through the family's medical insurance plan for outpatient therapy. Plaintiffs' contention that Mother shared that diagnosis with the District in a timely fashion, however, is not persuasive. Mother's testimony at the administrative hearing about the various evaluations that Brooklyn received comes across as jumbled, and she did not testify about how or when exactly she conveyed to the District this second-grade diagnosis of depression. N.T. (6/16/2021), ECF No. 2-7 at 51. On cross-examination Mother was asked: "[T]he February 2019 report from

12

[Children's Guidance Resource Center], you did not share that with the District until the fall of 2020, correct?" – a reference to when the District's records first reflect its awareness of this diagnosis.  She answered, "I don't recall."  *Id.* at 104.  Plaintiffs adduced no evidence – such as a cover letter or transmittal email – to corroborate Mother's recollection offered in the administrative hearing over two years later or to otherwise undermine the District's position that it did not know of the depression diagnosis during second grade.

The absence of any documentation from Mother or notation in the District's records that Mother advised the District of a depression diagnosis during the second-grade academic year is only more conspicuous in light of the many opportunities for Mother to have communicated this information during second grade.  The community mental health evaluation, which appears to have been completed on February 18, 2019, would have pre-dated by only a few days the parents' completion of forms that were received by the District on February 26, 2019 as part of Brooklyn's IEP re-evaluation for speech therapy.  Those forms inquired about Brooklyn's strengths, needs, communication concerns, medical history, and outside activities.  Neither parent referred to this new diagnosis or any concerns about any emotional dysregulation.  Two months later, in April 2019, Brooklyn's parents were invited to participate in an IEP meeting to discuss the re-evaluation of Brooklyn's need for speech and therapy services.  At that April 12, 2019 meeting, Mother agreed with the termination of the IEP.  ECF No. 2-9 at 123-26.  None of the records of that meeting indicate that Mother shared the recent depression diagnosis or the fact that Brooklyn was seeing a therapist during that time.

There was more than one opportunity for Mother to have communicated to the District from February 2019 until the end of the 2018-19 academic year that Brooklyn suffered from depression if Mother were concerned that this condition impacted Brooklyn's learning.  Plaintiffs

13

also had the opportunity at the administrative hearing to develop this factual record further but failed to do so. The chronology of when the District became aware of Brooklyn's outside evaluations and diagnoses leads me to find as a matter of fact that Mother did not make the depression diagnosis known to the District during Brooklyn's second-grade year.

Plaintiffs have not demonstrated by a preponderance of the evidence that the District knew or reasonably should have known during Brooklyn's second-grade year that she had a disability under Section 504.

### 4. The District did not violate its Section 504 Child Find obligation in the Third Grade year (2019-20).

No formal evaluation of Brooklyn was conducted by the District, nor requested by the family either within or outside school during this academic year, which was marked in the latter portion by the onset of the Covid-19 pandemic and remote schooling. The classroom teacher was in contact with Mother in early November of this school year when Brooklyn was having a difficult morning. Mother asked that Brooklyn be referred to the school social worker, who had assisted Brooklyn before. There is no evidence that Mother shared with the teacher that Brooklyn had a break in therapy since the summer or that she had been diagnosed with depression the previous February. The classroom teacher, who had significant prior experience as a special education teacher, did not observe anything that she believed warranted a referral for a special education evaluation, and she characterized Brooklyn's behaviors to be typical of third graders.

Plaintiffs have not demonstrated by a preponderance of the evidence that the District knew or reasonably should have known during Brooklyn's third-grade year that she had a disability under Section 504.

> **C. The District satisfied its Child Find obligation in the Fourth Grade year (2020-21).**

As recounted above, in the fall of Brooklyn's fourth-grade year, while students were still attending school remotely, Mother asked the District to develop a Section 504 Plan because Brooklyn was a "sensitive, dramatic child." Ex. P-10. The District promptly agreed to conduct a comprehensive special education evaluation, which assessed Brooklyn's cognitive, academic, and social-emotional functioning to determine her needs and her eligibility for special education and/or related services. The District implemented a Section 504 Plan in January 2021, which the Hearing Officer later required the District to improve. The District thus satisfied its Child Find obligation under Section 504 in the fourth-grade year.

V.  **CONCLUSION**

The administrative record is clear that in both instances where Mother requested a full psychoeducational evaluation – kindergarten and fourth grade – the District responded in a reasonable timeframe with an appropriate range of assessment tools. Prior to Mother's request in the fall of 2020 – when Brooklyn was in fourth grade, her schooling was offered remotely due to the pandemic, and the District was unaware of her mental health diagnoses – the District would not have had a reason to believe that Brooklyn qualified as disabled under Section 504. Based on the information at its disposal, the District reasonably declined to conduct the comprehensive evaluation that Mother requested in kindergarten. And while Brooklyn may have begun to experience emotional struggles in second grade, the extent of her condition was not known to the District as to have warranted a full psychoeducational evaluation during that year either. As evaluators noted, Brooklyn's emotional dysregulation was more evident at home than at school, and Mother did not share information from what was going on at home in this regard with the District.

Plaintiffs cannot meet their burden of persuasion that the District breached its "child-find" obligation by failing to identify Brooklyn as having a disability requiring accommodation under Section 504 prior to when it did so.  Because I do not find a violation of Section 504, there is no basis to award any additional compensatory education.

I will deny Plaintiffs' motion for judgment on the administrative record.


　　　　　　　　　　　　　　　　　___s/ANITA B. BRODY, J._____
　　　　　　　　　　　　　　　　　ANITA B. BRODY, J.